**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEAN BAPTISTE RIDORE, AKA John
Ridore,
                    *Petitioner,*

            v.

ERIC H. HOLDER Jr., Attorney
General,
                    *Respondent.*

No. 08-71379

Agency No.
A030-689-693

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
August 31, 2011—San Francisco, California

Filed October 3, 2012

Before: Raymond C. Fisher and Johnnie B. Rawlinson,
Circuit Judges, and George H. Wu, District Judge.*

Opinion by Judge Fisher

---

*The Honorable George H. Wu, United States District Judge for the
Central District of California, sitting by designation.

## COUNSEL

Kari Elisabeth Hong (argued), Law Office of Kari E. Hong, Oakland, California, for the petitioner.

Kiley L. Kane (argued), Trial Attorney, United States Department of Justice; OIL, United States Department of Justice; Mary Jane Candaux, Assistant Director, United States Department of Justice; John Hogan, Senior Litigation Counsel, United States Department of Justice, Washington, D.C.; Chief Counsel ICE, Office of the Chief Counsel, Department of Homeland Security, San Francisco, California, for the respondent.

## OPINION

FISHER, Circuit Judge:

Jean Baptiste Ridore petitions for review of a decision of the Board of Immigration Appeals (BIA) ordering him removed to his native Haiti. The BIA vacated the decision of the immigration judge (IJ) granting Ridore protection under the Convention Against Torture (CAT) and cancellation of

removal. Ridore argues that the BIA acted beyond the scope of its authority under 8 C.F.R. § 1003.1(d)(3) by reviewing the IJ's findings under a de novo rather than clear error standard and improperly engaging in its own factfinding. We agree that the BIA committed legal error in vacating the IJ's decision with respect to the CAT protection claim, and therefore grant Ridore's petition and remand to the BIA to review the IJ's CAT findings applying the clear error standard. As to cancellation of removal, the BIA applied the correct standard of review, so we deny Ridore's petition to that extent. We vacate, however, that part of the BIA's order and remand to the BIA for reconsideration in light of our remand on Ridore's CAT claim.

## BACKGROUND

Ridore, a native and citizen of Haiti, was admitted to the United States as a lawful permanent resident in 1973, at the age of 12. His father, sister and brother are United States citizens. Ridore lived with his mother and grandmother. When he was approximately 21 years old, Ridore's mother and grandmother were killed, and he discovered their murdered bodies in their home. He subsequently developed a problem with alcohol, and between 1991 and 2004 he was convicted of a string of criminal offenses, including petit larceny, theft, criminal trespass, possession of drug paraphernalia, second degree commercial burglary, failure to maintain liability insurance, failure to use a safety restraint, fictitious registration display, obscene conduct, reckless driving, failure to provide proof of insurance, speeding, operating without liability insurance, driving without privileges and, on three occasions, driving while intoxicated. Ridore came to the attention of the federal immigration authorities, who initiated the removal proceedings that are the basis of this appeal.

*Initial Proceedings.* In 2003, the Department of Homeland Security (DHS) issued Ridore a Notice to Appear (NTA) alleging that he was removable under 8 U.S.C.

§ 1227(a)(2)(A) for having been convicted of a felony relating to theft or burglary and sentenced to a term of imprisonment of at least one year, and for having committed two crimes of moral turpitude.

Ridore applied for cancellation of removal and moved to terminate removal proceedings, arguing that he had derivative citizenship through his father. The IJ found Ridore removable on both grounds alleged in the NTA, denied cancellation of removal because of Ridore's aggravated felony conviction and denied his motion to terminate removal proceedings because he failed to prove derivative citizenship.

On appeal, the BIA affirmed the finding that there was insufficient evidence of derivative citizenship, but reversed the IJ's finding that Ridore was removable as an aggravated felon. Because reversal of the aggravated felony charge made Ridore potentially eligible for relief that was previously barred, including withholding of removal and cancellation of removal, the BIA remanded the case to the IJ.

*2005 Proceedings Before the IJ on Remand.* On remand, Ridore in 2005 added applications for asylum, withholding of removal and CAT protection to his pending cancellation of removal proceeding. The IJ heard testimony from Ridore, his brother Evald and — most relevant to this appeal — an expert witness, Michelle Karshan, the founder of Alternative Chance, an organization that provides aid to criminal deportees in Haiti. The IJ also reviewed an affidavit from Karshan, the State Department's 2004 Country Report on Haiti's Human Rights Practices and "numerous background materials" Ridore submitted.

The parties were provided an opportunity to submit briefs on the significance of *In re J-E-*, 23 I. & N. Dec. 291 (BIA 2002) (en banc), *abrogated on other grounds by Azanor v. Ashcroft*, 364 F.3d 1013, 1019-20 (9th Cir. 2004), in which the BIA rejected a similar claim for CAT protection based on

the detention and life-threatening conditions criminal deportees allegedly faced in Haitian prisons. In April 2005, the IJ denied Ridore's applications for asylum and withholding of removal but granted CAT protection and cancellation of removal. The IJ concluded that CAT protection was warranted because Ridore's specific circumstances and the current conditions in Haiti's prisons were distinguishable from those existing at the time of *In re J-E-*, such that cancellation was warranted as a matter of discretion.

*2007 Appeal to the BIA.* The DHS appealed the IJ's decision to the BIA, which sustained the appeal and vacated the IJ's grant of CAT protection and cancellation of removal. The BIA concluded that Ridore's case was controlled by *In re J-E-* for the purposes of his CAT protection claim, and that a discretionary grant of cancellation was unwarranted. Ridore now petitions for review.

## JURISDICTION AND STANDARD OF REVIEW

We have exclusive jurisdiction over petitions for review of final orders of removal. *See* 8 U.S.C. § 1252. We have jurisdiction to review Ridore's legal challenges to the BIA's denial of his CAT claim pursuant to § 1252(a)(2)(D). Although we typically may not review the BIA's finding that a case does not warrant a discretionary grant of cancellation of removal, *see id.* § 1252(a)(2)(B)(i), such jurisdiction stripping provisions do not apply where, as here, the petitioner raises a question of law — whether the BIA acted within its regulatory authority. *See Afridi v. Gonzales*, 442 F.3d 1212, 1218 (9th Cir. 2006), *abrogated on other grounds by Estrada-Espinoza v. Mukasey*, 546 F.3d 1147 (9th Cir. 2008).

We review factual findings for substantial evidence, *see Azanor*, 364 F.3d at 1018, and legal questions de novo, *see De Martinez v. Ashcroft*, 374 F.3d 759, 761 (9th Cir. 2004). Whether the BIA has applied the correct standard of review

is a question of law. *See Rodriguez v. Holder*, 683 F.3d 1164, 1169 (9th Cir. 2012).

## DISCUSSION

**[1]** The central question presented here is whether the BIA, in overruling the IJ's grants of CAT protection and discretionary cancellation of removal, failed to apply a clear error standard of review to the IJ's factual findings and engaged in factfinding that it is not authorized to do in its appellate function. The governing regulations explicitly state that the BIA shall not "engage in *de novo* review of findings of fact determined by an immigration judge." 8 C.F.R. § 1003.1(d)(3)(i). Rather, "[f]acts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." *Id.* The BIA may, however, "review questions of law, discretion, and judgment . . . de novo." *Id.* § 1003.1(d)(3)(ii). "Where the BIA engages in de novo review of an IJ's factual findings instead of limiting its review to clear error, it has committed an error of law." *Rodriguez*, 683 F.3d at 1170. Further, the BIA may "not engage in factfinding in the course of deciding appeals." 8 C.F.R. § 1003.1(d)(3)(iv).

Ridore argues that the BIA violated these regulations, either by failing to justify its rejection of evidence the IJ relied upon or by ignoring it entirely — essentially engaging in de novo review and its own factfinding. We agree with him as to his CAT claim, but not as to cancellation of removal, although we conclude that the BIA should reconsider its discretionary ruling in light of our remand on the CAT claim.

## I.   CAT Protection

The essence of Ridore's claim for protection under CAT is the likelihood that immediately upon his return to Haiti he will be put into prison for a prolonged time under horrific

conditions that his expert testified and the IJ found would be almost "equivalent to a death warrant" and qualify as "torture" under CAT.

**[2]** The BIA sitting en banc in 2002 addressed and rejected a similar claim in *In re J-E-*, 23 I. & N. Dec. 291. There, a Haitian criminal deportee sought CAT relief, arguing that if removed he would be detained indefinitely in prison where the conditions were inhumane and the guards mistreated prisoners, and that such detention constituted torture. An applicant may be eligible for CAT protection when he or she can show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see also Unuakhaulu v. Gonzales*, 416 F.3d 931, 939 (9th Cir. 2005). "In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered." 8 C.F.R. § 1208.16(c)(3). This may include "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal." *Id.* § 1208.16(c)(3)(iii). "For an act to constitute torture it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions." *In re J-E-*, 23 I. & N. Dec. at 297 (citing 8 C.F.R. § [1]208.18(a)). In *In re J-E-*, the BIA concluded that, although the Haitian prison conditions were deplorable, the deportee had not carried his burden of showing they met the definition of torture under CAT. First, the BIA held that although the imprisonment practices were "unacceptable and must be discontinued, there is no evidence that Haitian authorities [we]re detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering." *Id.* at 300. Instead, the BIA concluded that the Haitian government's attempts to improve prison conditions, and willingness to allow human rights organizations to monitor prison

conditions and provide assistance, demonstrated that the poor conditions were "the result of budgetary and management problems as well as the country's severe economic difficulties." *Id.* at 301. The BIA also held that because Haiti has a "legitimate national interest in protecting its citizens from increased criminal activity," and because its detention procedures are "designed 'to prevent the bandits from increasing the level of insecurity and crime in the country,' " Haiti's detention "policy is a lawful sanction." *Id.* at 300 (quoting U.S. Dep't of State, Haiti, Country Reports on Human Rights Practices — 2000 (Feb. 2001)).

The key questions, therefore, are whether Ridore provided evidence sufficient to show that the prison conditions in Haiti have changed for the worse since *In re J-E-* was decided, undermining the factual predicates for that decision, and whether he has shown individual circumstances in *his* case that there is a likelihood he will face "torture" qualifying him for CAT. *Cf. Lopez v. Ashcroft*, 366 F.3d 799, 805 (9th Cir. 2004) (holding that, in the asylum context, "the BIA must provide an individualized analysis of how changed conditions will affect the specific petitioner's situation" (citation and internal quotation marks omitted)). The IJ found on the record before him there was, in fact, such evidence.

## A. IJ Decision

The IJ recognized that he was "bound by the . . . decision in [*In re*] *J-E-*." We have deferred to the BIA's conclusion in *In re J-E-* that detention of criminal deportees *alone* — when there is no evidence of specific intent to inflict severe pain or suffering — is insufficient to constitute torture under CAT. *See Theagene v. Gonzales*, 411 F.3d 1107, 1113 (9th Cir. 2005); *see also Villegas v. Mukasey*, 523 F.3d 984, 989 (9th Cir. 2008). The IJ here, however, made several factual find-

ings that led him to conclude that Ridore's case was distinguishable.[1] The IJ summarized his findings and conclusions thus:

> In this case, [Ridore] . . . only needs to show that he will be subjected to torture for any reason. . . . [W]e have the testimony of Ms. Karshan who testified that clearly this individual upon his return back to Haiti will be turned over to the Haitian authorities who will immediately intern him in one of their prison facilities where he will be held indefinitely while the authorities determine what should be done with him. This is based on the policy of the Haitian authorities who fear that these individuals who have been convicted of crimes in the United States will return back to Haiti where they will commit further crimes.

> In this case, the Court is bound by the Board's decision in [*In re*] *J-E-*, [where the Board found] that the evidence submitted by the respondent did not establish that conditions he would face in Haiti met the definition of torture because the Haitian government's policy of detaining criminal deportees constitutes a lawful sanction, there was not a showing of specific intent; and the detention was not imposed for a prescribed purpose, such as coercion or discrimination.

> In this case though, the Court feels that this case can be distinguished from [*In re*] *J-E-*. The Haitian constitution makes it unlawful to detain persons not

---

[1] We do not decide whether the IJ's assessment of the evidence or his factual findings and conclusions therefrom were correct. That was and remains the BIA's responsibility, at least in the first instance. As we shall explain, with specific examples, we hold that the BIA did not properly evaluate the IJ's findings, in some cases at all, and in any event not under the proper standard of clear error review. Accordingly, we shall remand to the BIA to review the IJ's CAT decision anew.

involved in criminal activity. Therefore, this Court will not find that the Haitian government's policy of indefinite detention of aliens not being charged with a crime in Haiti can constitute legal sanctions.

Furthermore, *the conditions in Haitian prisons have continuously declined over the past year. These conditions have now risen to the point that incarceration in a Haitian prison is almost the equivalent to a death warrant.* And even [if] not, that the conditions are so deplorable where disease is so rampant that these individuals detained in these prisons will have to suffer some long term problems that . . . can only be described as acts of torture. Not only do the Haitian authorities have a duty to protect their citizens whether they are criminals or not, but they have an ethical and moral duty to see that the people detained in their prisons are not subject to such harsh conditions that they are life threatening. Clearly, *the fact that they allow beriberi and tuberculosis to run rampant through the prison population, cannot be solely attributable to being unable to change those conditions.* Clearly, *the fact that they do not maintain proper medical facilities in those institutions can only be attributable to their willingness to use the jails to harm the inmates so that they will never be a threat to the population again.* That is not the purpose of a prison institution, to kill off its inmates so as to reduce the criminal element in the country.

The reports also indicate *the government has placed in authority persons who were previously accused of committing human rights abuses. Therefore, one can only assume that these people are being put in authority with the knowledge of the government that they will continue their old practices of abusing as well as torturing the inmates under their custody.* Furthermore, one only has to look at the

prison population which is largely former supporters of the previous government and criminal detainees deported from [the] United States. Therefore, again, one can only assume that these people were put in charge because the government, as a policy, wishes to have the prison population subjected to torture and other acts.

A question [that] arises though is whether or not the harsh conditions in prison constitutes [sic] torture. Torture . . . is any act by which "severe pain or suffering" is intentionally inflicted on persons. In this case, it cannot be said that the respondents are subject to severe pain. Although, again, I would assume that having beriberi or tuberculosis or some other life threatening disease probably has, as an element, severe pain. But, clearly, the fact that Congress stated that it is either severe pain *or* suffering also indicates that suffering may also be an element of torture. And, clearly, suffering from malnutrition or disease is clearly severe suffering and, therefore, constitutes an act of torture.

Therefore, in this case clearly *[Ridore] is facing a long time imprisonment. He has no family in Haiti* who can care for him. Furthermore, he has no family in Haiti who can arrange with the authorities to have [him] released into their custody. Based on Ms. Karshan's statements that these individuals, therefore, face long term imprisonment, . . . the Court must find that the likelihood that [Ridore] would suffer torture in that case is very likely.

(Citations omitted and emphases added).

On the government's appeal, the BIA vacated the IJ's decision notwithstanding his fact-based findings. We address first

the BIA's standard of review, and then its decision overturn-
ing the IJ.

## B.   BIA Standard of Review

As Ridore points out, the BIA's decision nowhere mentions
a standard of review. The government argues that, regardless,
the BIA properly disagreed with the IJ that as a matter of law
Ridore's circumstances were distinguishable from *In re J-E-*;
it therefore did not apply de novo review to fact findings or
make any of its own, but simply weighed the evidence differ-
ently.

Such weighing of the evidence, the government contends,
is permitted under the BIA regulations as interpreted in *Mat-
ter of V-K-*, 24 I. & N. Dec. 500 (BIA 2008). *Matter of V-K-*
considered the BIA's authority to reverse an IJ's determina-
tion that an applicant was entitled to CAT protection and held
that, "while we review[ ] the Immigration Judge's factual rul-
ings for clear error, we do not consider a prediction of the
probability of future torture to be a ruling of 'fact.' " 24 I. &
N. Dec. at 501. The BIA concluded that § 1003.1(d)(3)'s reg-
ulatory history "indicates that there was no intent to apply the
restrictive 'clearly erroneous' test to mixed questions of fact
and law where the so-called 'fact' consists of a finding as to
the degree of possibility of a result occurring that is necessary
to sustain a statutory basis for eligibility (e.g., . . . the chance
of . . . torture if the alien is removed)." *Id.*

The BIA reached this conclusion relying in part on the
comments accompanying the regulations providing that "[t]he
'clearly erroneous' standard does not apply to determinations
of matters of law, nor to the application of legal standards, in
the exercise of judgment or discretion. This includes judg-
ments as to whether the facts established by a particular alien
amount to 'past persecution' or a 'well-founded fear of future
persecution.' " *Id.* (quoting Board of Immigration Appeals:
Procedural Reforms To Improve Case Management, 67 Fed.

Reg. 54,878, 54,890 (Aug. 26, 2002)). In the BIA's estimation, "an Immigration Judge's prediction or finding regarding the likelihood that an alien will be tortured may be reviewed de novo because, like a conclusion relating to whether a statutorily prescribed chance of persecution or level of hardship exists, it relates to whether the ultimate statutory requirement for establishing eligibility for relief was met and is therefore a mixed question of fact and law, or a question of 'judgment.' " *Id.* at 501-02. Ultimately, the BIA stated that "[i]n reviewing the record, we disagreed with the Immigration Judge's mixed factual and legal determination that a preponderance of the evidence showed that it was more likely than not that the respondent would be tortured . . . ." *Id.* at 502. The BIA noted that in reaching this conclusion, it "*only assessed the facts as found by the Immigration Judge and established by the evidence entered into the record, determining that they were insufficient to meet the respondent's burden of proof for protection.*" *Id.* (emphasis added). The BIA added, "[w]e believe that we acted in accordance with the relevant regulations and our role as an appellate body. 8 C.F.R. § 1003.1(d)(3). Indeed, it would appear essential to the performance of our appellate function as contemplated by the Attorney General that we possess the authority to review de novo findings deemed by an Immigration Judge to satisfy an ultimate statutory standard." *Id.* Although we have not ruled on the correctness of *Matter of V-K-*, the Third Circuit has in a thoughtful opinion that adds this important gloss:

> In the case of the likelihood of torture, there are two distinct parts to the mixed question: *(1) what is likely to happen to the petitioner if removed*; and (2) does what is likely to happen amount to the legal definition of torture? The two parts should be examined separately.
>
> *The first question is factual.* A finding that a petitioner is likely to be imprisoned (based, for instance, on the evidence of gross violations of human rights

in the country of removal) is a finding of fact. A finding that a petitioner is likely to be extorted for vast sums of money if removed (based, for example, on the testimony of the petitioner and his expert) is also a finding of fact. So is a finding that a petitioner is likely to be beaten by government officials based on a finding that the petitioner was severely beaten in the past. This is to be distinguished from the legal consequence of those underlying facts.

The second question, however, is a legal question. Torture is a term of art, and whether imprisonment, beating, and extortion are severe enough to rise to the level of torture is a legal question. While the underlying facts vary from petitioner to petitioner, the legal question remains the same: *do the facts found by the IJ (and that the BIA determines are not clearly erroneous)* meet the legal requirements for relief under the CAT? This is a question of law where the IJ has no comparative advantage over the BIA.

*Glueing the two questions together, however, does not entitle the BIA to review the first question, the factual one,* de novo. *It must break down the inquiry into its parts and apply the correct standard of review to the respective components.*

*Kaplun v. Attorney Gen.*, 602 F.3d 260, 271 (3d Cir. 2010) (emphases added); *see also Rodriguez*, 683 F.3d at 1176-77 (in "ma[king] its own findings as to the accuracy of the historical facts discussed" by a witness and "making its own finding regarding [the petitioner's] credibility," the BIA impermissibly "substituted its own reading of the evidence for that of the IJ without applying the deference required by the clear error standard of review," thereby violating 8 C.F.R. § 1003.1(d)(3)(i)). Here the government argues that the BIA accepted the IJ's factual findings, but vacated the decision

because it was "not persuaded that [Ridore's] case [was] distinguishable from [*In re*] *J-E-*." Ridore argues, however, that the BIA's decision in fact improperly conflated these "two distinct parts" by applying a de novo standard of review to the IJ's factual findings — to the extent it even considered them — and improperly engaged in its own factfinding.

## C. BIA Decision

The BIA rejected the IJ's CAT ruling in a single, largely conclusory paragraph that essentially recited the general conclusions the BIA reached in 2002 in *In re J-E-*. It did not address most of the IJ's specific factual findings, nor the evidence underlying his findings — particularly the extensive evidence provided by Ridore's expert witness, Michelle Karshan, upon whom the IJ extensively relied. To the extent it cited any facts, the BIA relied on *In re J-E-* and DHS's "assert[ions] on appeal." The net effect of the BIA's approach, therefore, was to apply an overall de novo review, the very approach the Third Circuit rejected in *Kaplun*. *See* 602 F.3d at 271-72. The BIA's flawed approach impeaches its conclusions on several key issues.

### 1. Whether the Haitian government was acting with specific intent to torture criminal deportees

The IJ concluded that "the [Haitian] government, as a policy, wishes to have the prison population subjected to torture." In reaching this conclusion, he made several findings about the current (2005) state of prison conditions relating to lack of food, water and medical treatment, prevalence of disease and abusive guards — aspects of Haiti's prisons that the BIA in *In re J-E-* had already agreed were deplorable and intolerable at the level they existed in 2000. In evaluating CAT claims, "we must assess the conditions as they currently exist." *Villegas*, 523 F.3d at 989. The IJ supported his findings about the decline from 2000 conditions with the most recent (2004) State Department Country Report, and Kar-

shan's expert opinion. For example, he noted that Karshan's report found:

> [C]onditions in Haitian prisons have declined so much . . . that prison conditions have now become death warrants for those interned in them. She note[d] that potable water is virtually unavailable to the individuals. Food, unless provided by the families, is very meager. Furthermore, the prisoners themselves have a hierarchy which controls what little food is made available. Therefore, without money as well, these individuals who are interned often have difficulty securing food for their sustenance. [Karshan] also noted that . . . medical facilities in these prisons [are] virtually nonexistent. Considering the conditions of these prisons, it is not uncommon for the prisoners to contract various diseases as outlined in the Country Reports. She note[d] that tuberculosis is on the rise in these facilities.

Based on this and other hearing testimony and documents, the IJ found that "the conditions are so deplorable where disease is so rampant that these individuals detained in these prisons will have to suffer some long term problems that . . . can only be described as acts of torture."[2] "[T]he fact that they allow beriberi and tuberculosis to run rampant through the prison population, cannot be solely attributable to being unable to change those conditions. Clearly, the fact that they do not maintain proper medical facilities in those institutions can only be attributable to their willingness to use the jails to harm the inmates so that they will never be a threat to the population again."

**[3]** The BIA summarily rejected (or ignored) these findings with the oblique statement that "while we acknowledge

---

[2]The IJ was careful to base his finding of torture on "severe suffering" rather than "severe pain."

that prison conditions in Haiti appear to have deteriorated since we rendered our decision in [*In re*] *J-E-*, *supra*, that does not undermine the rationale of our decision." This short shrift approach is error. The BIA cannot, under a clear error standard of review, override or disregard evidence in the record and substitute its own version of reality. *See Kaplun*, 602 F.3d at 271-73 & n.9. This is particularly so when the BIA's justifications for rejecting a finding of torture in *In re J-E-* turned on the respondent's failure to meet his burden to produce evidence to support a finding of torture sanctioned by the Haitian government. *See In re J-E-*, 23 I. & N. Dec. at 303. The IJ found that the evidence Ridore produced, both as to worsened prison conditions and the Haitian government's complicity in creating those conditions, was sufficient to distinguish his case from *In re J-E-*, and the BIA was obligated to explain why the IJ clearly erred in so finding.

For instance, in addressing the IJ's findings regarding the government's hiring of likely abusive prison officials, the BIA tersely concluded that "the Immigration Judge's leap, from noting that persons accused of committing human rights abuses have been placed in charge of some of Haiti's prisons, to his conclusion that the government, therefore, put those people in charge because it wishes to have the prison population subjected to torture [is] illogical." Such a conclusory pronouncement does not constitute clear error review. If it is true that the Haitian government has a policy of placing accused human rights violators in charge of prisoners, as the IJ found it does, then there is nothing illogical in inferring the government intends to put those prisoners at risk of cruel, abusive treatment that would qualify as "severe suffering" or "torture" — as the IJ found.[3] If the BIA found clear error in the IJ's evidentiary basis for his finding, it surely did not reveal what that

---

[3]The BIA did not appear to dispute the IJ's factual predicate that "persons accused of committing human rights abuses have been placed in charge of some of Haiti's prisons."

error was. Instead, it appears to have relied simply on its own interpretation of the facts, which is not clear error review.

### 2.   *Whether Haiti's detention policy is a lawful sanction*

**[4]** "Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law . . . but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture." 8 C.F.R. § 1208.18(a)(3). The IJ decided that, because "[t]he Haitian constitution makes it unlawful to detain persons not involved in criminal activity," "the Haitian government's policy of indefinite detention of aliens not being charged with a crime in Haiti can[not] constitute legal sanctions." Explaining this conclusion, the IJ cited the declining "deplorable" conditions discussed above and the minor nature of Ridore's crimes.[4] Specifically, the IJ found Ridore's theft convictions to have involved minor offenses, and explained at some length why they could not justify "long term incarceration" under such life-threatening conditions as an appropriate, lawful sanction. Without discussing these findings and analysis, the BIA simply relied on its "contrary result" in *In re J-E-* that held that "Haiti's detention policy does appear to be a lawful sanction designed to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad." It said nothing about the IJ's analysis of Ridore's minor criminal record and why prolonged imprisonment of Ridore under conditions amounting to torture would not be a lawful sanction.

---

[4]It is not clear whether the IJ's reference to the Haiti constitution, which existed at the time of the BIA's decision in *In re J-E-*, was an independent ground for his rejection of a legal sanction, or simply part of his reasoning why Ridore's indefinite detention for *his* minor offenses could not, consistent with the constitution, be a legal sanction. Again, we do not know how the BIA understood the reference.

Moreover, it is notable that *In re J-E-* used the term "indefinite detention" in reference to a procedure whereby, pending determination of a release date by a commission that meets irregularly, "detainees may be held for *weeks* in police holding cells before they are released." *In re J-E-*, 23 I. & N. Dec. at 293, 300-01 (emphasis added). Previously the processing took no more than a week. *Id*. at 300. In this case, the IJ found that Ridore risks detention of a much greater duration, well beyond some "weeks." The IJ explained that Ridore "is facing a long time imprisonment" because of his lack of family support in Haiti, such that Ridore will "very likely" suffer prolonged exposure to the life-threatening prison conditions that constitute "torture." Here, too, the BIA ignored this significant factual distinction between Ridore's "indefinite detention" and that involved in *In re J-E-*, a distinction that further undercuts the BIA's rationale in that case for finding Haiti's prison policy to be a lawful sanction.

### 3.    *Whether Ridore is likely to be subject to torture*

A petitioner is eligible for CAT protection only when he can establish by a preponderance of the objective evidence that "it is more likely than not that he or she will be subject to torture upon removal." *In re J-E-*, 23 I. & N. Dec. at 302. The BIA said, "[W]hile we acknowledge that the record reflects isolated acts of torture in Haiti's prisons, as we noted in [*In re*] *J-E-*, *supra*, such evidence is insufficient to establish that it is more likely than not that this particular respondent will be tortured." Once again, this misapprehends and thus misstates the totality of the IJ's findings and conclusions. The IJ did not find that Ridore was likely to be tortured just because there were "acts of torture in Haiti's prisons."

Rather, as we have explained above, he found based on Karshan's report that Ridore was likely to be tortured because, unlike the respondent in *In re J-E-*, Ridore did not have family members in Haiti and would therefore face a very prolonged period of detention under the life-threatening con-

ditions that make such imprisonment almost "a death war-
rant." The IJ based his factual findings on the evidentiary
record, particularly Karshan's expert report and testimony
regarding "the conditions in Haiti for deported criminal
aliens. She note[d] that upon their arrival in Haiti, criminal
deportees are immediately turned over to the police authori-
ties who intern these individuals in prisons. They are held in
prisons for long periods of time while their cases are
reviewed. She note[d] that these individuals are not released
except to family members who often have to agree that they
will be imprisoned should they not make the deportees avail-
able to the police when requested."

The IJ credited Karshan's opinion that "if [Ridore] was
returned back to his country [he] could expect a long deten-
tion in one of the various prisons scattered throughout Haiti.
Because he has no family in that country, the likelihood of
him being released would be virtually nonexistent. Because of
the conditions in these prisons, they would for [Ridore] be life
threatening either from disease or malnutrition, as well as pos-
sibly the routine brutality of those institutions." Accordingly,
the IJ found that "clearly [Ridore] upon his return back to
Haiti will be turned over to the Haitian authorities who will
immediately intern him in one of their prison facilities where
he will be held indefinitely while the authorities determine
what should be done with him." The IJ found that, unlike the
respondent in *In re J-E-*, Ridore "has no family in Haiti who
can arrange with the authorities to have [him] released into
their custody." The BIA did not address these findings.

**[5]** To summarize, throughout its CAT ruling the BIA
failed to grapple with the evidentiary record in this case and
to specifically address any clear errors the IJ made in his fac-
tual findings based on that evidence — evidence showing that
both Haiti's current prison conditions and Ridore's personal
circumstances are different from the record that prompted the
BIA's ruling in *In re J-E-*. The BIA in *In re J-E-* faulted the
respondent for not carrying his burden of proof. *See In re J-*

*E-*, 23 I. & N. Dec. at 303. Ridore, on the other hand, produced current documentary and expert evidence to show conditions have worsened and Ridore is at risk of torture. The IJ credited that evidence and issued a detailed and reasoned analysis of the facts existing in 2005 — four years later than *In re J-E-*. He found, on these facts, Ridore's case to be materially distinguishable.

**[6]** Rather than address the IJ's fact-based determinations, the BIA simply invoked statements from *In re J-E-* as if they were still factually correct and ignored the IJ's findings. That is not clear error review. It is not even apparent it would suffice as adequate de novo review. In any event, the BIA cannot disregard the IJ's findings and substitute its own view of the facts. Either it must find clear error, explaining why; or, if critical facts are missing, it may remand to the IJ. *See Rodriguez*, 683 F.3d at 1177 ("If the BIA concludes that it cannot properly review the IJ's decision without further factual development of the record, then the Board must remand the case to the IJ so that he may make the requisite factual findings."). The BIA did neither here, so we are compelled to grant Ridore's petition and remand to the BIA to reconsider the IJ's decision granting CAT relief, applying the clear error standard of review.

## II.  Cancellation of Removal

The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable if the alien "(1) has been an alien lawfully admitted for permanent residence for not less than 5 years, (2) has resided in the United States continuously for 7 years after having been admitted in any status, and (3) has not been convicted of any aggravated felony." 8 U.S.C. § 1229b(a). Even when an alien meets these eligibility requirements, however, he or she must establish that relief is warranted as a matter of discretion. *See In re C-V-T-*, 22 I. & N. Dec. 7, 10 (BIA 1998). In exercising discretion, the IJ must consider "the record as a whole," and "balance the adverse

factors evidencing the alien's undesirability as a permanent resident with the social and humane considerations presented [on] his (or her) behalf to determine whether the granting of . . . relief appears in the best interest of this country." *Id.* at 11 (internal quotation marks omitted).[5] The IJ found that Ridore had established the statutory prerequisites and, after balancing the favorable and negative considerations, concluded that he was entitled to cancellation of removal. On DHS's appeal, the BIA also reversed this ruling.

[7] As noted previously, although the BIA must review the IJ's factual findings under a clearly erroneous standard, *see* 8 C.F.R. § 1003.1(d)(3)(i), it "may review questions of law, *discretion*, and judgment . . . de novo," *id.* § 1003.1(d)(3)(ii) (emphasis added). Here, the BIA held that "when balancing the social and humane considerations presented in [Ridore's] favor against the adverse factors evidencing his undesirability as a permanent resident, the Immigration Judge gave disproportionate weight to the evidence of potential hardship to [Ridore] in Haiti as a criminal deportee." The BIA reasoned that "[c]arried to its logical conclusion, the Immigration Judge's analysis appears to suggest that any criminal alien from Haiti who is otherwise eligible to apply for cancellation of removal . . . would automatically be entitled to such relief. . . . Such a conclusion cannot stand." The BIA was "not per-

---

[5]"[F]avorable considerations include such factors as family ties within the United States, residence of long duration in this country (particularly when the inception of residence occurred at a young age), evidence of hardship to the respondent and his family if deportation occurs, service in this country's armed forces, a history of employment, the existence of property or business ties, evidence of value and service to the community, proof of genuine rehabilitation if a criminal record exists, and other evidence attesting to a respondent's good character." *Id.* Negative considerations include "the nature and underlying circumstances of the grounds of exclusion or deportation (now removal) that are at issue, the presence of additional significant violations of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency, and seriousness, and the presence of other evidence indicative of a respondent's bad character or undesirability as a permanent resident of this country." *Id.*

suaded that [Ridore's] negative equities in this case [we]re outweighed by the positive equities in his favor," and vacated the IJ's grant of cancellation of removal. Ridore argues that here, too, the BIA erroneously reviewed the IJ's factual findings de novo and engaged in its own factfinding. As explained below, we hold that for the most part, the BIA gave proper deference to the IJ's factual findings. However, in light of our remand of Ridore's CAT protection claim and the BIA's conclusion that the IJ gave "disproportionate weight" to Ridore's "potential hardship" in Haiti, we find it appropriate to vacate the BIA's ruling and remand for reconsideration of cancellation of removal as part of its reconsideration of CAT relief. To limit the scope of this part of our remand, we shall address Ridore's challenges to the BIA's ruling on cancellation of removal.

Ridore points to the BIA's articulation of the positive and negative equities, asserting that the BIA's list of equities differed from those set forth by the IJ, and the BIA therefore "overturn[ed] the IJ's findings and enter[ed] its own findings of fact." We disagree. Starting with the positive equities, Ridore argues that the BIA erred by failing to explicitly discuss two positive equities the IJ identified. First is the hardship that Ridore's removal would cause his father. The IJ, however, made no such finding, but rather the opposite:

> The respondent in this case has had a life of being transient and having little or no contact with his family. Clearly, his father will not suffer any physical hardships as a result of the respondent's removal from the United States. The respondent's father does not rely on the respondent for financial help, let alone any personal assistance that the respondent gives the respondent's father. This is based on the fact that he has been separated from his family since approximately 1994.

Second, Ridore argues that the BIA did not discuss the trauma he experienced upon finding the bodies of his brutally mur-

dered mother and grandmother, an experience the IJ believed led to "a majority" of Ridore's problems, particularly his becoming an alcoholic. The IJ, however, did not find this to be so much a positive equity but more a mitigating one that ultimately did not justify Ridore's criminal behavior. Rather, he found that Ridore's criminal history reflected "an individual who had little or no concern for the laws of this country," and whose alcoholism reduced the probability that Ridore would recover from his addiction and "turn [his] life around" to become a contributing member of society.

Ridore also contends that the BIA improperly relied on four negative equities the IJ did not find. These contentions are plainly contrary to the record. First, the BIA's statement that he had a "spotty" employment history echoes the IJ's description of Ridore's work history "in the last few years" as at best "very spotty, going from one job to another." Second, the BIA's statement that Ridore "has no history of service in this country's armed forces" repeats the IJ's finding that "respondent cannot show any military service." Third, the BIA did not, as Ridore contends, find "*as if it were reviewing the case for the first time*" that he does not "have property or business ties" in the United States. In fact, the IJ found that Ridore had "little or no community ties," and his descriptions of Ridore's transient lifestyle and spotty work history directly support the BIA's statement. Finally, the BIA's statement that there was "no proof of genuine rehabilitation in the record evidence that the Immigration Judge relied on" is accurate. Ridore himself testified that he "had never received treatment" for his use of drugs and alcohol. The IJ also remarked, "One wonders how often a person needs to be convicted of drunk driving before one should understand that he has an alcohol problem and do something about it."

We therefore reject Ridore's arguments that the BIA reviewed the IJ's findings on positive and negative equities de novo or engaged in its own factfinding. The BIA properly deferred to the IJ's factual findings with respect to the equities

Ridore challenges, citing such findings and the record as it recited each of Ridore's criminal convictions, his immigration history and his family background. Upon its weighing of these equities, the BIA made the discretionary judgment that these facts did not warrant the grant of cancellation of removal, holding that "the Immigration Judge gave disproportionate weight to the evidence of potential hardship to [Ridore] in Haiti as a criminal deportee," when comparing such evidence to the strong negative equities.

**[8]** Such review is largely appropriate. *See Matter of A-S-B-*, 24 I. & N. Dec. 493, 498 (BIA 2008) (the BIA did not "violate[ ] the prohibition against fact-finding on appeal" where it "relied on the predicate facts found by the Immigration Judge and did not evaluate any 'new' evidence submitted on appeal"), *abrogated on other grounds by Huang v. Attorney Gen.*, 620 F.3d 372 (3d Cir. 2010). However, as explained in our discussion of CAT relief, the BIA failed to give proper deference to the IJ's factual findings regarding conditions in Haiti. Those findings constitute "evidence of potential hardship to [Ridore] in Haiti as a criminal deportee" — the very evidence the BIA found insufficient to outweigh the negative equities. Because the BIA failed to credit the IJ's findings supporting his conclusion that Ridore has a likely risk of being tortured in Haitian prisons, and will be revisiting that issue on remand, the BIA will necessarily have to reconsider whether the IJ "gave disproportionate weight to the evidence of potential hardship to [Ridore] in Haiti as a criminal deportee." Accordingly, we vacate and remand the BIA's ruling on cancellation of removal so it may reconsider that ruling in tandem with its clear error review of Ridore's entitlement to CAT relief.

## CONCLUSION

We grant Ridore's petition for review. We remand to the BIA to review the IJ's CAT protection findings for clear

error, and to reweigh the cancellation of removal equities accordingly.

**PETITION FOR REVIEW GRANTED AND REMANDED.**