**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 14-2380**
_____

WILERMS OXYGENE,

      Petitioner,

   v.

LORETTA E. LYNCH, Attorney General,

      Respondent.

_____

**No. 15-1099**
_____

WILERMS OXYGENE,

      Petitioner,

   v.

LORETTA E. LYNCH, Attorney General,

      Respondent.

_____

On Petitions for Review of Orders of the Board of Immigration Appeals.

_____

Argued: December 8, 2015   Decided: February 22, 2016

_____

Before MOTZ, KING, and KEENAN, Circuit Judges.

_____

Petitions for review denied in part and dismissed in part by published opinion. Judge Motz wrote the opinion, in which Judge King and Judge Keenan joined.

———————————————

**ARGUED**: Tamara L. Jezic, YACUB LAW OFFICES, Woodbridge, Virginia, for Petitioner. Jeffery R. Leist, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF**: Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Ernesto H. Molina, Jr., Assistant Director, Gladys M. Steffens Guzman, Trial Attorney, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

———————————————

DIANA GRIBBON MOTZ, Circuit Judge:

Wilerms Oxygene petitions for review of orders denying his application for deferral of removal under the Convention Against Torture ("CAT") and subsequent motion to reopen his removal proceedings. For the reasons that follow, the petition for review is denied in part and dismissed in part.

I.

In 1994, Oxygene, accompanied by his mother and siblings, fled political violence in his native country of Haiti. This violence included occasions when death squads fired on the family home while Oxygene and others were inside the house. Oxygene entered the United States as a refugee; in 1996 the United States granted him lawful permanent resident status.

Five years later, a Virginia court convicted Oxygene of several state crimes, including burglary, grand larceny, robbery, and use of a firearm to commit a felony. In 2011, the Department of Homeland Security ("DHS" or "the Government") commenced removal proceedings against him. Oxygene conceded that he was removable under various subsections of 8 U.S.C. § 1227(a)(2) (2012) due to his convictions for aggravated felonies and firearm offenses, but applied for deferral of removal under the CAT.

3

At his removal hearing before an Immigration Judge ("IJ"), Oxygene testified to his family's past persecution in Haiti and his fear that, if removed, he would face indefinite detention in Haitian prisons. Oxygene also expressed fear that, if detained in Haiti, he would not receive the medical care necessary to prevent his latent tuberculosis from becoming active. Oxygene and his sister testified that they had no remaining family members in Haiti who could provide support in the form of food, medicine, or payment for release from detention.

Oxygene submitted documentary evidence to substantiate his allegations of poor prison conditions in Haiti. The administrative record contains several State Department country reports for Haiti, a report from various non-governmental organizations submitted to the United Nations ("the 2011 NGO report"), and news articles and press releases concerning human rights abuses in the country. Together, these sources paint a bleak picture of what criminal deportees like Oxygene can expect upon removal to Haiti.

According to the State Department country reports, as early as 2000, Haiti began detaining criminal deportees "who [have] already served full sentences overseas . . . for indefinite periods of time." The 2013 country report describes "detention center overcrowding" as "severe," explaining that "[i]n some prisons detainees slept in shifts due to lack of space" and that

4

"[s]ome prisons had no beds for detainees, and some cells had no access to sunlight." Prisoners and detainees generally had no access to treated drinking water, and approximately seventy percent "suffered from a lack of basic hygiene, malnutrition, poor quality health care, and water-borne illness." As a result, the report concludes that malaria, drug-resistant tuberculosis, and other infectious diseases present a "serious problem." The 2013 country report also states that, despite laws prohibiting such practices, on several occasions police "allegedly beat or otherwise abused detainees and suspects," and "corrections officers use[d] physical punishment and psychological abuse to mistreat prisoners."

The record is unclear as to whether Haiti's blanket policy of detaining criminal deportees remains in force. While the 2013 State Department report makes no mention of the policy, the 2011 NGO report indicates that Haitian officials have continued to detain a majority of criminal deportees immediately upon arrival. A 2013 press release by the human rights group Alternative Chance also notes skepticism as to recent claims by the Haitian government that it had abandoned the indefinite detention program.

The IJ carefully considered this documentary evidence and the testimony of Oxygene and his sister when evaluating Oxygene's claim for CAT relief. The IJ found "no doubt that

prison conditions in Haiti remain deplorable, and that as a criminal deportee [Oxygene] may possibly be held in custody upon his return to Haiti for some unknown period of time in those poor conditions." He also noted that Oxygene "could be at a higher risk than normal of disease, given his diagnosis of latent tuberculosis." Finally, the IJ recognized that "[t]he record evidence even indicates that there have been some incidents of mistreatment of Haitian prisoners so severe as to constitute torture."

Despite these findings, the IJ denied Oxygene's application for deferral of removal under the CAT. The IJ found that Oxygene had not demonstrated that it was more likely than not he would suffer torture upon removal to Haiti. The IJ concluded that application of BIA precedent, In re J-E-, 23 I. & N. Dec. 291 (BIA 2002) (en banc), foreclosed Oxygene's argument that Haiti's detention policy and prison conditions necessarily constitute torture under the CAT. This was so, the IJ explained, because Oxygene offered "no evidence that the [Haitian] authorities intentionally and deliberately detain deportees in order to inflict torture." Rather, the record only contained evidence of "isolated incidents" of mistreatment by correctional officers that would qualify as torture. Thus, Oxygene failed to meet the more-likely-than-not burden of proof required for relief under the CAT.

6

Oxygene appealed the IJ's removal order to the Board of Immigration Appeals ("BIA") and at the same time moved the BIA to remand the case for the IJ to consider whether Oxygene's recent diagnoses of post-traumatic stress disorder and depression impacted his CAT claim. The BIA affirmed the removal order and denied the remand motion for lack of evidence concerning the recent diagnoses. Oxygene then moved the BIA to reconsider this decision, attaching relevant medical evidence and an article on the stigma associated with mental illness in Haiti. The BIA construed this filing as a timely motion to reopen the removal proceedings and denied it, concluding that Oxygene failed to show that the new evidence would change the result of the case.

Oxygene filed two appeals to this court -- one challenges the BIA's denial of his application for CAT relief, and the other challenges its denial of his motion to reopen the removal proceedings. We have consolidated the two cases.

II.

Oxygene concedes that a Virginia court convicted him of committing an aggravated felony. For this reason, Congress has limited our jurisdiction over his petition for review of the order denying him CAT relief to questions of law and constitutional claims. See 8 U.S.C. § 1252(a)(2)(C), (D)

7

(2012); Saintha v. Mukasey, 516 F.3d 243, 248 (4th Cir. 2008). Congress has similarly limited our review of the order denying his motion to reopen his removal proceedings. See § 1252(a)(2)(C), (D); Larngar v. Holder, 562 F.3d 71, 75 (1st Cir. 2009). Given this limitation, as a "threshold question," we must analyze each argument Oxygene raises to determine whether it presents a legal or constitutional question, or raises only a factual dispute. Saintha, 516 F.3d at 248-252.

In challenging the order denying his application for CAT relief, Oxygene offers two arguments. First, he maintains that In re J-E-, on which the IJ and BIA relied, incorrectly states the legal test for the intent necessary to establish torture under the CAT. This is a question of law over which we retain jurisdiction despite Oxygene's aggravated felony conviction. See 8 U.S.C. § 1252(a)(2)(D); Cherichel v. Holder, 591 F.3d 1002, 1009 (8th Cir. 2010). Oxygene argues in the alternative that, even if In re J-E- correctly states the intent requirement for CAT claims, the IJ and BIA erred in their application of that requirement to his case. At bottom, Oxygene contends that substantial evidence does not support the IJ and BIA decisions to deny him CAT relief. We ordinarily can "review[] decisions to deny CAT relief for substantial evidence." Suarez-Valenzuela v. Holder, 714 F.3d 241, 245 (4th Cir. 2013). But when an applicant for CAT relief has committed an aggravated felony,

8

§ 1252(a)(2)(C) eliminates appellate review for sufficiency of evidence. See Saintha, 516 F.3d at 249-50. Consequently, we lack jurisdiction to consider his alternative argument.[1]

In his challenge to the order denying his motion to reopen his application for CAT relief, Oxygene maintains that, given his recent mental health diagnoses, the BIA abused its discretion in denying relief. According to Oxygene, Haitian officials will likely single him out for torture because of the stigma associated with mental health conditions in Haiti. But the BIA disagreed, finding that that the record evidence, along with his newly proffered evidence, did not demonstrate that it was more likely than not Oxygene would suffer torture upon removal. This constitutes a quintessentially factual determination over which we lack jurisdiction. See Hernandez-Nolasco v. Lynch, 807 F.3d 95, 99 (4th Cir. 2015).

---

[1] Oxygene also raises a related claim of legal error in this alternative argument. According to Oxygene, the IJ and BIA committed legal error by "ignor[ing] unrebutted, legally significant evidence" and failing to offer a "reasoned explanation" for their rulings. Pet. Br. at 25. This argument fails. In fact, the IJ carefully considered Oxygene's testimony and documentary evidence, including facts that potentially distinguished his case from In re J-E-, before concluding that In re J-E- compelled him to deny the application. And the BIA's opinion affirming the IJ's decision adequately explains why the IJ's decision was correct.

9

Accordingly, we turn now to consider a single issue: whether In re J-E- states the correct legal standard for intent in CAT claims.

III.

The Government maintains that In re J-E- correctly articulates the intent element in the CAT definition of torture. According to the Government, to establish torture meriting CAT relief, Oxygene must demonstrate that Haitian officials specifically intend not only the act of detention, but also the severe pain and suffering that is the near-inevitable result of prolonged detention in Haitian prisons. The Government argues that mere knowledge does not suffice to prove intent. Rather, the alleged torturers must actually desire the consequences of their actions. Oxygene maintains that In re J-E- does not state the correct legal standard. He contends that the intent to detain, coupled with knowledge to a near certainty that severe pain and suffering will result, qualifies as specific intent to torture under the CAT.

To resolve this question, we must examine the CAT and its implementing regulations to determine its definition of torture and the resulting treaty obligations of the United States. The United Nations General Assembly adopted the CAT on December 10, 1984. See Convention Against Torture and Other Cruel, Inhuman

10

or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988). As a signatory to this multinational treaty, the United States agreed not to "expel, return (refouler) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Id. art. 3.1. The CAT defines torture, in relevant part, as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." Id. art. 1.1 (emphasis added).

Upon signing the CAT, the President proposed, and the Senate adopted, a number of reservations, understandings, and declarations. Relevant here is the understanding that "in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." S. Exec. Rep. 101-30, at 9, 30, 36 (1990) (emphasis added). Such an express understanding reflects the intent of the United States to influence how executive and judicial bodies later interpret the treaty on both the international and domestic level. See Stefan A. Riesenfeld & Frederick M. Abbot, The Scope of U.S. Senate Control over the Conclusion and Operation of Treaties, 67 Chi.-Kent L. Rev. 571, 604 (1991). Thus, by the time of ratification, the intent requirement in the CAT had acquired a "specific intent" gloss in the United States.

Congress enacted the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") to implement the CAT. See Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (codified as note to 8 U.S.C. § 1231 (2012)). FARRA itself does not define torture. Instead, it directs "the heads of the appropriate agencies [to] prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Id. Pursuant to FARRA, the Department of Justice promulgated regulations governing claims for CAT relief. See Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478-01 (Feb. 19, 1999) (codified at 8 C.F.R. §§ 208.16-208.18 (2016)).

These regulations adopt the specific intent interpretation of the definition of torture, echoing the understanding of the President and Senate. The regulations define torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. § 208.18(a)(1) (2016). A separate subsection provides that, "[i]n order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of

12

pain and suffering is not torture." Id. § 208.18(a)(5) (emphasis added).

Thus, every entity responsible for the progress of the CAT from treaty to domestic law of the United States -- the President, the Senate, and the Department of Justice -- made clear that, in order to qualify as torture under the treaty, an act must be specifically intended to cause severe pain and suffering. But at no point did any entity define specific intent. Nor did any entity address the question this case presents: whether an actor must actually desire to cause severe pain and suffering for his actions to constitute torture under the CAT. That task fell to the BIA, which in 2002 issued its en banc decision in In re J-E-, announcing the standard for evaluating CAT claims. See 23 I. & N. Dec. at 296-99. Thus, In re J-E- articulated a five prong test in defining torture under the CAT:

> (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

Id. at 297.

Most relevant here, In re J-E- expressly addressed whether the practice of the Haitian government of indefinitely detaining criminal deportees under horrific conditions constitutes

13

torture.  See id. at 303-04.  The BIA denied J-E-'s claim for CAT relief, finding it deficient under the test's second prong because he offered "no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering."  Id. at 300.  In so holding, the BIA rejected the applicant's argument that Haiti's detention of deportees with knowledge of the substandard conditions they will face in and of itself satisfied the specific intent requirement for torture under the CAT.  The BIA held that "[a]lthough Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard," the applicant needed to show that officials were "intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture" to secure relief under the CAT.  Id. at 301.

In re J-E- relied on the definition in Black's Law Dictionary that "[s]pecific intent is defined as the intent to accomplish the precise criminal act that one is later charged with while general intent commonly takes the form of recklessness or negligence."  Id. (internal quotation marks and alteration omitted).  On the record before it, the BIA found that "Haitian prison conditions are the result of budgetary and management problems as well as the country's severe economic difficulties," and not part of an intentional effort to punish

14

criminal deportees.  Id.  Consequently, the BIA denied the applicant's claim.[2]


IV.

With these legal principles in mind, we consider their application to the case at hand.

The BIA explained in In re J-E- that, as usually defined, "specific intent" constitutes "[t]he intent to accomplish the precise criminal act that one is later charged with."  23 I. & N. Dec. at 301 (quoting Intent, Black's Law Dictionary (10th ed. 2014)).  This contrasts with "general intent," defined as "[t]he intent to perform an act even though the actor does not desire the consequences that result."  Intent, Black's Law Dictionary. Thus, the distinction between specific and general intent rests on the mens rea related to the consequences of a wrongful act.

---

[2] The BIA in In re J-E- also held that the CAT claim failed under the test's third prong, finding no evidence that Haitian officials inflicted severe pain and suffering on detainees for a proscribed purpose.  See id. at 300.  The IJ in Oxygene's case made a similar finding.  In his petition for review, Oxygene makes a passing challenge to In re J-E-'s proscribed purpose holding, but fails to develop any arguments with respect to it. As a result, Oxygene has waived this argument.  See Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 607 (4th Cir. 2009).  Even if preserved and meritorious, Oxygene's argument concerning the purpose prong would not save his petition.  This is so because, as we explain in Part IV, Oxygene's challenge to the intent prong fails, providing an independent ground on which to deny his petition for review.

15

Haiti's detention of criminal deportees under extremely substandard conditions constitutes the challenged wrongful act both here and in In re J-E-. And in both cases, the applicant argues that this detention results in pain and suffering from malnutrition and disease severe enough to constitute torture under the CAT. The BIA in In re J-E- rejected that argument. The BIA concluded that, in light of the prevailing meaning of "specific intent," a claimant needed to show that Haitian officials "are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture," and that the record before it did not support such a finding. 23 I. & N. Dec. at 301. Put another way, In re J-E- requires a CAT claimant to demonstrate that the state actor who mistreats him desires to cause his severe pain and suffering, and is not merely negligent nor reckless as to the risk.

Oxygene argues that a claimant should be able to satisfy this requirement by demonstrating that an official acts with knowledge to a near certainty that he will cause severe pain and suffering. This constitutes one possible interpretation of the CAT and its implementing regulations, given the legal presumption that people intend the foreseeable consequences of their actions and given the trivial difference in culpability between one who desires harm and one who acts knowing he will cause harm. See United States v. Bailey, 444 U.S. 394, 404

16

(1980).   After all, no entity -- not the President, not the Senate, not the Department of Justice -- defined specific intent as the CAT progressed from treaty to domestic law.   And specific intent occupies a notoriously ambiguous space in the criminal law.   See, e.g., id. at 403.   Indeed, in In re J-E-, six of the BIA's nineteen board members agreed with the view Oxygene asserts here.   See 23 I. & N. Dec. at 304-318.

But the majority of the BIA in In re J-E- interpreted § 208.18(a)(5) as expressly foreclosing this argument.   While we review the BIA's legal conclusions de novo, we afford them appropriate deference.   See Turkson v. Holder, 667 F.3d 523, 527 (4th Cir. 2012); see also INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999).[3]   Such deference is well deserved here.   Although the conclusion reached by the BIA in In re J-E- is not the only plausible interpretation of the CAT, this interpretation accords with the prevailing meaning of specific intent and reflects the

---

[3] Despite consensus among our sister circuits that courts owe deference to In re J-E-, they have not agreed on the appropriate degree of deference due to the BIA.   Compare Auguste v. Ridge, 395 F.3d 123, 144-45 (3d Cir. 2005) (applying Chevron deference to uphold the BIA's interpretation as reasonable), with Pierre v. Gonzales, 502 F.3d 109, 116-17 (2d Cir. 2007) (affording the BIA "substantial deference" and citing cases applying the standard from Auer).   We need not wade into the debate over the proper degree of deference, for it makes no difference in this case.   The BIA's interpretation is not plainly erroneous nor inconsistent with the regulation under Auer, nor is it unreasonable under Chevron.

17

likely wish of the President and Senate to incorporate that meaning into the CAT regulations.

Courts routinely describe the requisite mens rea for specific intent crimes as akin to purpose or desire, rather than mere knowledge. The Supreme Court has noted that specific intent "corresponds loosely" with "purpose," whereas general intent "corresponds loosely" with "knowledge." Bailey, 444 U.S. at 405. This distinction holds true even when the actor possesses knowledge to a near certainty that something will occur. See, e.g., 21 Am. Jur. 2d Criminal Law § 119 (2015) ("[A] specific-intent crime requires not simply the general intent to do the immediate act with no particular, clear, or undifferentiated end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result; mere knowledge that a result is substantially certain to follow from one's actions is not the same as the specific intent or desire to achieve that result.") (emphasis added).

Of course, the factfinder in a criminal trial may infer an actor's desire to bring about a consequence from facts illustrating that he knew precisely what would result from his actions. Thus, judges regularly instruct juries in criminal cases that they may infer intent from knowledge. See, e.g., United States v. Arthur, 544 F.2d 730, 737 (4th Cir. 1976) ("An

18

instruction that it is reasonable to infer that a person ordinarily intends the natural and probable consequences of his voluntary acts has generally been held proper."). But it is the prerogative of the factfinder to make the inferential leap from knowledge to desire. Id. In this way, the factfinder remains free to consider facts suggesting that, despite a defendant's knowledge of a likely result, the defendant in fact did not desire a certain consequence. Oxygene's proposed interpretation of § 208.18(a) would preclude such an inquiry.[4]

Oxygene's contrary view ignores the significance of the understanding of the President and Senate at ratification that torture under the treaty required heightened intent. As explained above, the definition of torture in the CAT included an intent requirement. Section 208.18(a)(5) incorporates the

---

[4] None of the cases Oxygene cites suggest that the BIA rendered an unreasonable interpretation of § 208.18(a) in In re J-E-. At most, those cases illustrate the occasional difficulty courts have in applying the common-law concept of specific intent to particular facts or statutes. Even in United States v. Neiswender, 590 F.2d 1269, 1274 (4th Cir. 1979), where we held that knowledge of foreseeable consequences satisfied the intent element of a obstruction of justice conviction, the jury instruction we approved merely charged the jury to "find an intent to obstruct justice," noting that "[i]t is ordinarily reasonable to infer that a person intends the natural and probable consequences of acts knowingly done or undertaken." Id. (emphasis added). While we recognized that some courts had characterized obstruction of justice as a "specific intent" crime, we saw "no need to undertake an extended excursion into the subtleties of specific intent," and did not define the term. Id. at 1273.

19

instruction of the President and the Senate to require "specific intent" -- a more stringent standard than the unqualified "intent" from Article 1 of the CAT. The position of the BIA in In re J-E- accords with this instruction.

In contrast, Oxygene's argument goes a long way toward requiring only general intent for claims under the CAT, reading the explicit understanding of the President and Senate out of the regulation. While the President and Senate never expressly stated that knowledge to a near certainty would not constitute specific intent, at common-law the term "specific intent" traditionally referred to "certain narrow classes of crimes" where "heightened culpability has been thought to merit special attention." Bailey, 444 U.S. at 405. It was entirely reasonable for the BIA to conclude that the President and Senate wished to incorporate into the CAT regulations a more exacting intent standard that excludes mere knowledge when they chose a term traditionally associated with heightened intent.

In sum, we join the majority of our sister circuits, who have considered the issue, in deferring to the BIA's interpretation of the CAT's intent requirement as articulated in In re J-E-. See Villegas v. Mukasey, 523 F.3d 984, 988 (9th Cir. 2008); Pierre, 502 F.3d at 116-17 (2d Cir.); Auguste, 395 F.3d at 144 (3d Cir.); Cadet v. Bulger, 377 F.3d 1173, 1185-86 (11th Cir. 2004); Elien v. Ashcroft, 364 F.3d 392, 396-97 (1st

20

Cir. 2004). But see Cherichel, 591 F.3d at 1014 (8th Cir.) (affirming denial of CAT relief based on the court's own reading of the CAT and § 208.18(a) and taking no position on whether the BIA's interpretation in In re J-E- is entitled to deference).[5]

We note that, in many cases, In re J-E- will pose no significant hurdle for CAT applicants. For instance, if a CAT claimant proves it is more likely than not he will be abducted and severely beaten upon removal, the specific intent of the torturer to inflict pain and suffering on his victim would be established. Moreover, even for claims premised on Haitian prison conditions in which intent is more difficult to prove, In re J-E- does not prevent an IJ from inferring specific intent if the facts allow. Rather, In re J-E- leaves the window open to such claimants. See Pierre, 502 F.3d at 116, 118 n.6 (deferring to In re J-E- but noting that nothing in that opinion "prevents the agency from drawing the inference, should the agency choose

_____

[5] The fact that the BIA relied on a legal dictionary in its analysis, and that specific intent derives its meaning from criminal law, does not negate the deference due to the BIA. While the BIA may not have particular expertise in the construction of criminal laws, it is expert at construing ambiguous immigration regulations like § 208.18(a). For that same reason, Soliman v. Gonzales, 419 F.3d 276 (4th Cir. 2005), offers Oxygene no assistance. In Soliman we declined to defer to the BIA's interpretation of a Virginia criminal statute. See 419 F.3d at 281. Soliman thus involved a very different question than the deference due the BIA when interpreting not a state statute but an immigration regulation promulgated by the federal government.

to do so, that a particular course of action is taken with specific intent to inflict severe pain and suffering").[6]

Thus, other CAT applicants have succeeded where Oxygene and the applicant in In re J-E- fell short. For example, at his removal hearing, the petitioner in Ridore v. Holder offered testimony from an expert witness as to the intent of Haitian officials in their detention of criminal deportees. See 696 F.3d 907, 910, 916-17 (9th Cir. 2012). Accordingly, the IJ in Ridore assessed a more robust factual record than that in In re J-E- (and here). On that basis, the IJ there found that allowing disease "to run rampant through the prison population" and failing to "maintain proper medical facilities in those institutions [could] only be attributable to [Haitian officials'] willingness to use the jails to harm the inmates so that they will never be a threat to the population again." Id. at 913. Accordingly, the IJ granted CAT relief. Id. at 912-14.

---

[6] Some commentators have asserted that after In re J-E- the BIA has categorically denied CAT claims based on prison conditions in Haiti. See, e.g., Renee C. Redman, Defining "Torture": The Collateral Effect on Immigration Law of the Attorney General's Narrow Interpretation of "Specifically Intended" When Applied to United States Interrogators, 62 N.Y.U. Ann. Surv. Am. L. 465, 482 (2007). To the extent that individual IJs or BIA members interpret In re J-E- as a categorical impediment to CAT relief, they misread that precedent. In its treatment of specific intent under the CAT, the BIA in In re J-E- merely held that the record facts in that case did not support an inference that the Haitian officials desired the pain and suffering of its detainees. See 23 I. & N. Dec. at 300-01.

The BIA reversed. Id. at 914. But the Ninth Circuit held there was "nothing illogical" in the IJ's findings "inferring the government intends to put those prisoners at risk of cruel, abusive treatment that would qualify as 'severe suffering' or 'torture.'" Id. at 917. For that reason, the court granted the petition for review. Id. at 917, 919.

We call attention to Ridore as an example of how, even when a court defers to the BIA's interpretation of specific intent in In re J-E-, a Haitian citizen may be able to obtain CAT relief. Of course, the record in Oxygene's case does not contain similar evidence as to Haitian officials' specific intent to torture, and the IJ and BIA declined to infer such intent.

V.

In conclusion, we reject Oxygene's contention that the IJ and BIA committed legal error in following the precedent established in In re J-E- to deny his application for deferral of removal under the CAT. Accordingly, we deny his petition for review of that order. We dismiss for lack of jurisdiction Oxygene's petition for review from the order denying his motion to reopen.

DENIED IN PART AND DISMISSED IN PART