**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILFREDO GARAY REYES, *Petitioner*, | No. 14-70686 |
| v. | Agency No. A094-330-535 |
| LORETTA E. LYNCH, Attorney General, *Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 6, 2016
Seattle, Washington

Filed November 30, 2016

Before: Michael Daly Hawkins, Johnnie B. Rawlinson,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

## SUMMARY[*]

### Immigration

Granting in part and denying in part a petition for review of the Board of Immigration Appeals' decision affirming the denial of withholding of removal and protection under the Convention Against Torture, the panel afforded Chevron deference to the Board's articulation in *Matter of W–G–R–*, 26 I. & N. Dec. 208 (BIA 2014) and *Matter of M–E–V–G–*, 26 I. & N. Dec. 227 (BIA 2014) of its "particularity" and "social distinction" requirements for demonstrating membership in a "particular social group" for purposes of withholding relief, but held that the Board applied an impermissible standard of review in assessing the request for CAT relief.

The panel held that the Board's construction of the "particularity" requirement, which focuses on whether the group is discrete or is, instead, amorphous, is reasonable and consistent with its own precedent, which has long required that a particular social group have clear boundaries and that its characteristics have commonly accepted definitions.

The panel held that the Board's articulation of its "social distinction" requirement, which requires evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group, is also reasonable.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Applying that framework, the panel held that the Board reasonably determined that petitioner's proposed particular social group of "former members of Mara 18 gang" lacks particularity and social distinction, and that his proposed social group of "deportees from the United States to El Salvador" lacks particularity.

The panel remanded the CAT claim to allow the agency to reconsider the application for CAT relief recognizing that killings can constitute torture, and to undertake the requisite fact finding in accordance with the agency's regulations.

## COUNSEL

Anne Dutton (argued) and Zachary A. Albun, Student Attorneys; Benjamin Richard Casper, Supervising Attorney; University of Minnesota Law School, Center for New Americans, Federal Immigration Litigation Clinic, Minneapolis, Minnesota; Alma David, Global Justice Law Group, PLLC, Seattle, Washington; for Petitioner.

W. Manning Evans (argued) and Susan B. Green, Senior Litigation Counsel; Benjamin C. Mizer, Principal Deputy Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

L. Rachel Lerman, Barnes & Thornburg LLP, Los Angeles, California; Chris Bayh, Barnes & Thornburg LLP, Indianapolis, Indiana; for Amicus Curiae Harvard Immigration and Refugee Clinical Program.

Fatma E. Marouf, Associate Professor of Law, Las Vegas, Nevada, as and for Amicus Curiae Immigration Clinic, University of Nevada, Las Vegas, William S. Boyd School of Law.

Brook Dooley and Sophie Hood, Keker & Van Nest LLP, San Francisco, California, for Amici Curiae Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Center for Gender & Refugee Studies, and American Immigration Lawyers Association.

---

## OPINION

CALLAHAN, Circuit Judge:

Wilfredo Garay Reyes, a native and citizen of El Salvador, petitions for review of a precedential Board of Immigration Appeals ("BIA") opinion in *Matter of W–G–R–*, 26 I. & N. Dec. 208 (BIA 2014), wherein the BIA dismissed Garay's appeal from an Immigration Judge's ("IJ") denial of Garay's applications for withholding of removal and relief from removal under Article 3 of the Convention Against Torture ("CAT relief").[1]  Garay claims he is entitled to withholding of removal because, if removed to El Salvador, he will more likely than not face persecution on account of his membership in a particular social group consisting of "former members of the Mara 18 gang in El Salvador who have renounced their gang membership" and, alternatively, a

---

[1] Withholding of removal, 8 U.S.C. § 1231(b)(3), and protection against removal under Article 3 of the Convention Against Torture ("CAT"), 1465 U.N.T.S. 85, G.A. Res. 39/46, 39th Sess., U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984).

group consisting of deportees from the United States to El Salvador. Garay also maintains that he is entitled to CAT relief because he faces a clear probability of torture from the Mara 18 gang, Salvadoran death squads, and Salvadoran government actors.

We have jurisdiction under 8 U.S.C. § 1252. We deny Garay's petition in connection with his claims for withholding of removal. We conclude that the BIA's articulation of its "particularity" and "social distinction" requirements for demonstrating membership in a "particular social group" are entitled to *Chevron* deference. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). We also conclude that the BIA reasonably determined that Garay's proposed particular social groups of "former members of Mara 18" and "deportees from the United States to El Salvador" are not cognizable. However, because the IJ committed legal error and the BIA employed an impermissible standard of review in assessing Garay's request for CAT relief, we grant Garay's petition with respect to the denial of his CAT claim.

# I

## A

In 2000, at the age of seventeen, Garay joined the Mara 18 gang in El Salvador. Upon joining Mara 18, Garay participated in three to five robberies of wealthy ranchers. Four months after Garay joined the gang, a new and more violent leader, named Francisco, took over, and the gang committed a string of armed bank robberies under his leadership. Garay, armed with a gun, served as a driver for two or three heists.

Disenchanted with Francisco's leadership style and not wishing to be further involved in bank robberies, Garay decided to leave the gang after being a member for less than a year. Garay went into hiding, moving to another town. Garay feared retribution or reprisals from Francisco, who had previously announced that anyone trying to leave could be punished with beatings or death.

After Garay fled, Francisco found Garay and shot him in the leg. Some months later, Garay was confronted in a billiard hall by machete-wielding assailants. He defended himself with his own machete and a handgun. In late 2000, Garay had his gang tattoo removed. Shortly thereafter, Garay left El Salvador and made his way to the United States.

Garay entered the United States without inspection in May 2001, at age eighteen. Now thirty-three years old, Garay has a wife and two daughters. There is no indication that Garay has been involved with gangs since entering the United States.

**B**

On March 25, 2009, Immigration and Customs Enforcement ("ICE") issued a Notice to Appear, alleging that Garay was unlawfully present and should be removed. Garay conceded removability as charged. Garay, represented by counsel, testified before the IJ on January 14, 2010.

Following the hearing, the IJ issued an oral decision, in which he found Garay credible. The IJ pretermitted Garay's application for asylum because it had not been filed within a year of his entry into the United States.

Addressing Garay's withholding claim, the IJ concluded that, although Garay had been subjected to persecution in El Salvador, he had not established that he was persecuted on account of his membership in a particular social group consisting of "former members of Mara 18 in El Salvador who have renounced their gang membership." The IJ noted Garay's four-to-six month active membership in Mara 18 and reasoned that "[a]lthough the respondent has clearly indicated that he wishes to renounce his gang membership, he cannot disassociate himself from the volitional activities with which he was involved as a member of the Mara 18 gang." The IJ also noted that Garay had submitted background materials "which indicate that El Salvadoran gangs may have multiple motivations and modus operandi in their particular groups."

Denying Garay's withholding claim, the IJ cited *Arteaga v. Mukasey*, 511 F.3d 940 (9th Cir. 2007), and *Matter of E–A–G–*, 24 I. & N. Dec. 591 (BIA 2008), as authority for the proposition that membership in a violent criminal gang cannot serve as the basis for a particular social group. The IJ did not address whether Garay had demonstrated a nexus to his purported membership in a social group. The IJ also did not address Garay's alternative proposed social group of "deportees from the United States to El Salvador."

Addressing Garay's claim for CAT relief, the IJ noted that Garay had testified that he feared arrest by the police and that he could be subject to reprisals from his former fellow gang members if removed to El Salvador. The IJ concluded that Garay had not shown a likelihood that he would be arrested because Garay had failed to demonstrate that the police have been searching for him or that he had been charged with any crimes in El Salvador. Regarding reprisals from the gang, the IJ stated that Garay had "suggested in his written application

for relief that if he is located by his former gang that he could be subject to various brutal forms of treatment, including having a tire placed on him being filled with gasoline." However, the IJ observed that Garay had not mentioned his fear of that specific threat during his hearing, but had "indicated that he believes that he would be killed by his former gang members." The IJ then stated that the materials Garay had submitted "contain little if any information concerning the treatment of former gang members such as [himself] upon their return to El Salvador beyond being killed." The IJ concluded that Garay had "failed to demonstrate by any standard that he would be subjected to torture."

The IJ ordered Garay removed to El Salvador. Garay timely appealed to the BIA.

## C

On February 7, 2014, the BIA panel dismissed Garay's appeal in a precedential decision, *Matter of W–G–R–*, 26 I. & N. Dec. 208 (BIA 2014). In *Matter of W–G–R–*, and in a companion precedential decision issued the same day, *Matter of M–E–V–G–*, 26 I. & N. Dec. 227 (BIA 2014), the BIA clarified the requirements that an applicant for asylum or withholding of removal must satisfy in order to demonstrate membership in a particular social group. The applicant must "establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *M–E–V–G–*, 26 I. & N. Dec. at 237; *see also W–G–R–*, 26 I. & N. Dec. at 212.

In *Matter of W–G–R–*, the BIA reviewed its historical efforts to construe the statutory term "particular social group" as it applies in asylum and withholding cases. 26 I. & N. Dec. at 209–10. The BIA explained that its articulation of the "particularity" and "social visibility" requirements was not a departure from or abrogation of its construction of a "particular social group" in *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985).[2] *Id.* at 211–12 (citing *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc)). Instead, the BIA explained, the requirements "clarified the definition of the term ['particular social group'] to give it more 'concrete meaning through a process of case-by-case adjudication.'" *Id.* at 212 (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)). In *Matter of W–G–R–*, the BIA adhered to its previous holdings that "both particularity and social visibility are critical elements in determining" the cognizability of a particular social group, but re-named the "social visibility" criterion as "social distinction." *Id.*

The BIA observed that the term "particularity" is included in the plain language of the statute. *Id.* at 213. The BIA explained that "[t]he particularity requirement also derives from the concept of immutability . . . clarifying the point, at least implicit in earlier case law, that not every immutable characteristic is sufficiently precise to define a particular social group." *Id.* The BIA explained that "the focus of the particularity requirement is whether the group is discrete or is, instead, amorphous." *Id.* at 214.

The BIA clarified that the term "social distinction" was intended to replace the term "social visibility." "Social

---

[2] The BIA did not discuss any changes to the immutability requirement.

distinction" more accurately describes the function of the requirement and reflects that it is not intended to require "literal," "ocular," or "on-sight" visibility. *Id.* at 211, 216. Beyond that, the BIA clarified:

> To have the "social distinction" necessary to establish a particular social group, there must be evidence showing that *society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group*. Although the society in question need not be able to easily identify who is a member of the group, it must be commonly recognized that the shared characteristic is one that defines the group.

*Id.* at 217 (emphasis added).

The BIA explained that its decision not to focus the "social distinction" inquiry solely on the persecutor's perspective was based, in part, on the fact that the inquiry into whether a group is a "particular social group" is distinct from the inquiry into the "nexus" requirement, which considers whether a person is persecuted "on account of" membership in a particular social group.[3] *Id.* at 218.

---

[3] An asylum or withholding applicant's burden includes (1) "demonstrating the existence of a cognizable particular social group," (2) "his membership in that particular social group," and (3) "a risk of persecution on account of his membership in the specified particular social group." *Matter of W–G–R–*, 26 I. & N. Dec. at 223 (citing *Ayala v. Holder*, 640 F.3d 1095, 1097–98 (9th Cir. 2011)). The third element is often referred to as the "nexus" requirement.

Turning to Garay's withholding claim, the BIA agreed with the IJ that Garay's proposed group of "former members of the Mara 18 gang in El Salvador who have renounced their gang membership" was not cognizable. *Id.* at 221. The BIA reasoned that "[t]he group as defined lacks particularity because it is too diffuse, as well as being too broad and subjective." *Id.* The BIA commented that, "[a]s described, the group could include persons of any age, sex, or background. It is not limited to those who have had a meaningful involvement with the gang and would thus consider themselves—and be considered by others—as 'former gang members.'" *Id.*

Addressing the "social distinction" requirement, the BIA stated that "[t]he record contains scant evidence that Salvadoran society considers former gang members who have renounced their gang membership as a distinct social group." *Id.* at 222. The BIA concluded that Garay had not provided evidence demonstrating that his proposed particular social group is "perceived, considered, or recognized in Salvadoran society as a distinct group." *Id.*

Having determined that Garay had not demonstrated membership in a cognizable group, the BIA did not need to address the "nexus" requirement. However, it held in the alternative that Garay had "not demonstrated the required nexus between the harm he fears and his status as a former gang member." *Id.* at 223. The BIA noted that while persecution can be a factor in determining whether a group is recognized as a distinct group within the relevant society, "the persecutor's views play a greater role in determining whether persecution is inflicted on account of the victim's membership in a particular social group." *Id.* The BIA then determined that Garay had "not shown that any acts of

retribution or punishment by gang members would be motivated by his status as a former gang member, rather than by the gang members' desire to enforce their code of conduct."[4] *Id.* at 224.

The BIA also rejected Garay's proposed social group of deportees from the United States to El Salvador. The BIA found that the proposed group is "too broad and diverse a group to satisfy the particularity requirement for a particular social group under the Act." *Id.* at 223 (citing *Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1151–52 (9th Cir. 2010) (per curiam)). The BIA explained:

> The respondent's purported social group could include men, women, and children of all ages. Their removal from the United States could be based on numerous different factors. The length of time they were in the United States, the recency of their removal, and

---

[4] As we affirm the BIA's determination that Garay failed to demonstrate membership in a cognizable group, *see infra*, we do not reach the BIA's treatment of nexus. We note, however, that the BIA's differentiation between the status of being a former gang member and the retributory acts of the gang has been criticized. *See Oliva v. Lynch*, 807 F.3d 53, 60 (4th Cir. 2015) ("[T]he BIA drew too fine a distinction between Oliva's status as a former member of MS-13 and the threats to kill him for breaking the rules imposed on former members. While it is true that Oliva's decision to stop paying rent . . . was the immediate trigger for the gang's brutal assault on Oliva, it was Oliva's status as a former gang member that led MS-13 to demand rent in the first place and to assault him for failure to pay it.").

> societal views on how long a person is considered a deportee after repatriation could vary immensely.

*Id.*

Finally, the BIA reviewed the IJ's denial of CAT relief for clear error, and affirmed. *Id.* at 224–26. It reviewed evidence in support of Garay's claims that he feared torture at the hands of rival gangs, the police, or clandestine death squads, *id.* at 224–25, but concluded that "the Immigration Judge's predictive findings with respect to the respondent's torture claim [we]re not clearly erroneous . . . ." *Id.* at 225.

In a footnote to its CAT analysis, the BIA addressed Garay's challenge to the IJ's statement that the background materials Garay had submitted contained little information about the treatment former gang members face "beyond being killed." *Id.* at 226 n.9. The BIA disagreed with Garay's characterization of the IJ's decision "as holding that [Garay] faces a danger of being killed but that death is not torture." *Id.* The BIA read the IJ's statement not as an assertion that killings are not torture but, rather, as "h[o]ld[ing] that the evidence was not sufficient to show a clear probability that the respondent would be tortured." *Id.*

Garay timely petitioned for review of the final order of removal entered by the BIA.

## II

The primary issue in this case is whether we should accord deference to the BIA's "particularity" and "social distinction" requirements for establishing the existence of a

"particular social group," as articulated in the precedential opinion in Garay's case, *Matter of W–G–R–,* 26 I. & N. Dec. 208.

The BIA's construction of ambiguous statutory terms in precedential decisions is entitled to deference under *Chevron,* 467 U.S. at 844. *Henriquez–Rivas*, 707 F.3d at 1087. We must accept the BIA's construction if it is reasonable, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("*Brand X*"). Consistency with the agency's past practice or precedent is not required for an agency interpretation to be due *Chevron* deference; a new or varying agency interpretation is permitted, if it is adequately explained. *Id.* at 981.

Garay contends that the BIA's "particularity" and "social distinction" requirements are unreasonable, unreasoned, and impermissibly prevent individuals from seeking asylum. We disagree and conclude that BIA's present articulation of the "particularity" and "social distinction" requirements is consistent with the statute, reflects the agency's ongoing efforts to construe the ambiguous statutory phrase "particular social group," is reasonable, and is entitled to *Chevron* deference.

## A

The phrase "membership in a particular social group" is not defined in the statute and has spawned extensive debate

and litigation.[5] *Matter of W–G–R–* and *Matter of M–E–V–G–* are the latest in a long line of BIA decisions refining the contours of this ambiguous statutory provision.

The BIA first interpreted "persecution on account of membership in a particular social group" in *Matter of Acosta*, applying the doctrine of *ejusdem generis* to conclude that the phrase means "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic." 19 I. & N. Dec. at 233, *overruled on other grounds in Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987).

In the ensuing years, *Acosta*'s immutable characteristic test "led to confusion and a lack of consistency as adjudicators struggled with various possible social groups, some of which appeared to be created exclusively for asylum purposes." *Matter of M–E–V–G–*, 26 I. & N. Dec. at 231. In response to calls for greater clarity, and in order to address the evolving nature of the claims presented by asylum applicants, "the BIA refined the *Acosta* standard by stating that an asylum applicant must also demonstrate that his proposed particular social group has 'social visibility' and 'particularity.'" *Henriquez-Rivas*, 707 F.3d at 1084 (quoting *Matter of C–A–*, 23 I. & N. Dec. 951, 957, 960 (BIA 2006)); Matter of *M–E–V–G–*, 26 I. & N. Dec. at 232. The "social visibility" requirement considered whether the proposed particular social group was "easily recognizable and understood by others to constitute [a] social group[]." *Matter of C–A–*, 23 I. & N. Dec. at 959–61.

---

[5] *See Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 594 (3d Cir. 2011) ("The concept is even more elusive because there is no clear evidence of legislative intent.").

In subsequent cases, the BIA further elaborated on the meaning of the "particularity" and "social visibility" requirements. In *Matter of S–E–G–*, 24 I. & N. Dec. 579, 584 (BIA 2008), the BIA stated "[t]he essence of the 'particularity' requirement, therefore, is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." In *Matter of E–A–G–*, 24 I. & N. Dec. 591, 594 (BIA 2008), the BIA explained "[t]he purported group's social visibility—i.e., the extent to which members of a society perceive those with the characteristic in question as members of a social group—is of particular importance in determining whether an alien is a member of a claimed particular social group."

The BIA's attempts to clarify its "social visibility" requirement received mixed reviews from the circuit courts. In *Henriquez-Rivas*, 707 F.3d at 1085, we noted that most circuits had accepted the BIA's "social visibility" and "particularity" criteria, but that the Third and Seventh Circuits had rejected the criteria as an unreasonable interpretation of the ambiguous statutory term.

In *Henriquez-Rivas*, we "clarif[ied] the 'social visibility' and 'particularity' criteria without reaching the ultimate question of whether the criteria themselves are valid," i.e., whether they were due *Chevron* deference. *Id.* at 1091.[6] We

---

[6] Since *Henriquez-Rivas*, we have issued opinions in two cases involving the meaning of "membership in a particular social group." *Flores Rios v. Lynch*, 807 F.3d 1123 (9th Cir. 2015); *Pirir-Boc v. Holder*, 750 F.3d 1077 (9th Cir. 2014). In both cases, we acknowledged that the BIA had revisited its interpretation of the phrase "particular social group" in *M–E–V–G–* and *W–G–R–*. *Flores Rios*, 807 F.3d at 1124, 1127; *Pirir-Boc*, 750 F.3d at 1079, 1082–84. However, in neither case did we address

did, however, comment that "[s]o long as the 'social visibility' and 'particularity' criteria are applied in a way that did not directly conflict with prior agency precedent, we would be hard-pressed to reject the new criteria as unreasonable under *Chevron*." *Id*. at 1089.

**B**

We now hold that the BIA's interpretation in *W–G–R–* and *M–E–V–G–* of the ambiguous phrase "particular social group," including the BIA's articulation of the "particularity" and "social distinction" requirements is reasonable and entitled to *Chevron* deference. We consider the requirements in turn.

**1**

We recognized in *Henriquez-Rivas* that the "particularity" requirement is distinct from the "social visibility" requirement. "The 'particularity' requirement is separate, and it is relevant in considering whether a group's boundaries are so amorphous that, in practice, the persecutor does not consider it a group." 707 F.3d at 1091.

The BIA's current articulation of its "particularity" requirement is reasonable and is consistent with its own precedent, which has long required that a particular social group have clear boundaries and that its characteristics have commonly accepted definitions. *See, e.g.*, *Matter of S–E–G–*, 24 I. & N. Dec. at 585 (rejecting as too amorphous a proposed group of "male children who lack stable families

---

what deference was due the BIA's new articulation of its construction of "membership in a particular social group."

and meaningful adult protection, who are from middle and low income classes, who live in the territories controlled by the MS-13 gang, and who refuse recruitment"); *Matter of A–M–E– & J–G–U–*, 24 I. & N. Dec. 69, 76 (BIA 2007) (explaining that "affluent Guatemalans" did not qualify as a particular social group in part because the "characteristic of wealth or affluence is simply too subjective, inchoate, and variable to provide the sole basis for membership"); *Matter of C–A–*, 23 I. & N. Dec. at 953, 959, 961 (rejecting a proposed group of "noncriminal drug informants working against the Cali drug cartel" due, in part, to the fact that the distinction between government informants who had been compensated for their services and those who acted out of civic motives was not sufficient to carve out a particular "subgroup" of uncompensated informants); *Matter of V–T–S–*, 21 I. & N. Dec. 792, 798 (BIA 1997) (holding "Filipino[s] of mixed Filipino-Chinese ancestry" cognizable as a particular social group in part because a country conditions report stated that 1.5% of the Philippine population had an "identifiable" Chinese background). The BIA's statement of the purpose and function of the "particularity" requirement does not, on its face, impose a numerical limit on a proposed social group or disqualify groups that exceed specific breadth or size limitations. Nor is it contrary to the principle that diversity within a proposed particular social group may not serve as the *sine qua non* of the particularity analysis. *Cordoba v. Holder*, 726 F.3d 1106, 1116 (9th Cir. 2013); *Henriquez-Rivas*, 707 F.3d at 1093–94. Rather, the BIA imposes the "particularity" requirement in order to distinguish between social groups that are discrete and those that are amorphous. *Matter of W–G–R–*, 26 I. & N. Dec. at 214. Recognizing that, in order to be "particular," a group must have some definable boundary is not unreasonable.

We thus find the definition of the "particularity" requirement articulated in *W–G–R–* and *M–E–V–G–* to be both reasonable and consistent with the BIA's own precedent. *Brand X*, 545 U.S. at 980–81.

**2**

The BIA's articulation of its "social distinction" requirement is also reasonable. The "social distinction" requirement is not, as Garay contends, a "new" requirement. Rather, the "social distinction" requirement is reasonably read to be precisely what the BIA characterizes it to be: a renaming of the "social visibility" requirement. *Matter of W–G–R–*, 26 I. & N. Dec. at 212.

In *Henriquez-Rivas*, we did not reject the erstwhile "social visibility" requirement as an "unreasoned concept," as alleged by Garay. Rather, we examined the concept and concluded that the "social visibility" inquiry cannot require "on-sight" visibility. We held that the proper inquiry is whether a proposed particular social group's shared characteristic or characteristics would "generally be recognizable by other members of the community," or whether there was "evidence that members of the proposed group would be perceived as a group by society." 707 F.3d at 1088–89 (internal quotation marks omitted). The BIA's explanation of its "social distinction" requirement is consistent with our articulation of the appropriate inquiry.

Additionally, although we commented in *Henriquez-Rivas* on the potential import of the persecutor's perspective in assessing "social visibility," *id.* at 1089 ("Looking to the text of the statute, in the context of persecution, we believe that the perception of the persecutors may matter the most."), the

agency is not bound by our belief, as we did not hold that it was the only reasonable construction of an unambiguous statutory term.[7]   *Brand X*, 545 U.S. at 981; *Pirir-Boc*, 750 F.3d at 1083 n.6 (noting that *Henriquez-Rivas* left the issue for the BIA to decide).   Moreover, the BIA's articulation of the "social distinction" requirement does not preclude consideration of the persecutor's perspective. Rather, as we acknowledged in *Pirir-Boc*, the BIA has noted at least two ways in which the "perception of the applicant's persecutors may be relevant."[8]   750 F.3d at 1083 n.6.   We noted that, "while the BIA did not give the persecutor's perspective the same role in the analysis as the one [this Court] had recommended [in *Henriquez-Rivas*], it did give that perspective an important place." *Id.* Accordingly, the BIA's "social distinction" requirement does not unreasonably discount the perceptions of persecutors.

Finally, the "social distinction" requirement is not redundant in light of the "nexus" requirement for asylum and withholding claims.   Rather than conflate the "social distinction" and "nexus" requirements, the BIA's reasoning reflects an appreciation of the need to distinguish between the showing an applicant must make in order to demonstrate membership in a "particular social group" and the showing that is necessary to demonstrate that he was persecuted, or

---

[7] Our belief was not unanimous.   In a concurring opinion, Judge McKeown observed that "[d]efining social visibility from the perspective of society better comports with the case law" and "also makes common sense." *Henriquez-Rivas*, 707 F.3d at 1094 (McKeown, J., concurring).

[8] These are (1) when persecution may lead to a group's initial recognition, and (2) in cases of persecution on account of imputed grounds. *Pirir-Boc*, 750 F.3d at 1083 n.6 (citing *M–E–V–G–*, 26 I. & N. Dec. at 242–43).

fears persecution, "on account of" that membership. This is consistent with the Supreme Court's conception of the "nexus" requirement. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (explaining that "the statute makes motive critical" and an asylum applicant must provide direct or circumstantial evidence of his persecutors' motives in order to satisfy the "nexus" requirement).

Accordingly, we reject Garay's challenges to the BIA's construction of the phrase "particular social group" because we find that the BIA's articulation of the "particularity" and "social distinction" requirements in *Matter of W–G–R–* is reasonable and entitled to *Chevron* deference.[9] *Brand X*, 545 U.S. at 981.

## III

Having determined that the BIA's definition of particular social group is entitled to *Chevron* deference, we next consider Garay's contention that the BIA erred in finding that his proposed social group of "former members of the Mara 18 gang in El Salvador who have renounced their membership" did not fit within that definition.

---

[9] Garay also argues that the BIA's analysis of international law is both incomplete and flawed, supporting rejection of its "social distinction" requirement. However, the BIA did consider international refugee standards and determined that its approach to defining a particular social group was not "fundamentally different from international standards." *Matter of W–G–R–*, 26 I. & N. Dec. at 221. Regardless, although the United Nations Protocol Relating to the Status of Refugees and United Nations High Commissioner for Refugees guidance may be useful in construing the provisions added to the Immigration and Nationality Act by the Refugee Act, they do not have the force of law. *Aguirre-Aguirre*, 526 U.S. at 427; *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009).

"The Attorney General, while retaining ultimate authority, has vested the BIA with power to exercise the 'discretion and authority conferred upon the Attorney General by law' in the course of 'considering and determining cases before it.'" *Aguirre-Aguirre*, 526 U.S. at 425 (quoting 8 C. F. R. § 3.1(d)(1)). As a general rule, we review the BIA's denial of withholding of removal for substantial evidence. *Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2014) (citing *Pagayon v. Holder*, 675 F.3d 1182, 1190 (9th Cir. 2011)). Under the substantial evidence standard, we may reverse the BIA only on a finding "'that the evidence not only supports [a contrary] conclusion, but compels it—and also compels the further conclusion' that the petitioner meets the requisite standard for obtaining relief." *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. at 481 n. l.).

In *Aguirre-Aguirre*, the Supreme Court stated that "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'" 526 U.S. at 425 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448–49 (1987)). In *Henriquez-Rivas*, we held that we review the BIA's findings for substantial evidence, but that "[t]he BIA's construction of ambiguous statutory terms . . . is entitled to deference under *Chevron*." 707 F.3d at 1087. In this case, whether we apply a "*Chevron* deference" or "substantial evidence" standard of review—assuming they might in some instances be different—makes no difference, because the BIA's application of the "particularity" and "social distinction" criteria to Garay's withholding claims was reasonable.

The BIA's application of the "particularity" requirement to Garay is reasonable in light of the absence of record

evidence demonstrating that Salvadoran society recognizes the boundaries of a group comprised of former Mara 18 members who have renounced their membership, regardless of the length and recency of that membership. *Matter of W–G–R–*, 26 I. & N. Dec. at 221 ("The boundaries of a group are not sufficiently definable unless the members of society generally agree on who is included in the group, and evidence that the social group proposed by the respondent is recognized within the society is lacking in this case.").

Similarly, we agree that substantial evidence supports the BIA's conclusion that Garay's proposed group lacks social distinction. *Id.* at 222–23. The record evidence does, as Garay points out, include some evidence of rehabilitation programs run for the benefit of former gang members and of threats former gang members face from members of their own and other gangs. The record evidence does not, however, compel the conclusion that Salvadoran society considers former gang members as a distinct social group, e.g., distinct from current gang members who may also avail themselves of government programs or from suspected gang members who face discriminatory treatment and other challenges in Salvadoran society. *See Vitug v. Holder*, 723 F.3d 1056, 1062 (9th Cir. 2013) ("We review for substantial evidence the factual findings underlying the BIA's determination that a petitioner is not eligible for withholding of removal. . . .").

Accordingly, we reject Garay's challenges to the BIA's determination that his proposed social group of "former

members of the Mara 18 gang in El Salvador who have renounced their membership" is not cognizable.[10]

## IV

Garay also purports to challenge the BIA's denial of his withholding claim based on his membership in a particular social group consisting of "deportees from the United States to El Salvador." This assertion appears to have been an afterthought as his brief only asserts that the BIA's decision turned exclusively on particularity. The BIA's decision is entitled to deference, *see supra* page 21–22, and we conclude that the BIA's denial of withholding based on a particular social group of "deportees from the United States to El Salvador" is reasonable.

---

[10] Garay made two additional arguments, neither of which are persuasive. First, he argues that the BIA erred in relying on *Arteaga v. Mukasey*, 511 F.3d 940 (9th Cir. 2007), to find Garay's proposed social group was not cognizable. Although the IJ relied on *Arteaga*, the BIA did not and only mentioned *Arteaga* in a footnote. *Matter of W–G–R–*, 26 I. & N. Dec. at 215 n.5. Since *Arteaga* was not crucial to the BIA's decision, we express no opinion on the correctness of the BIA's footnote.

Second, Garay argues that the BIA's articulation of the "particularity" and "social distinction" requirements imposed a new evidentiary standard and the BIA's failure to give him an opportunity to meet that new standard denied him due process. We note that Garay submitted extensive country conditions evidence in support of his application and has identified no additional evidence that he would have submitted that might change the outcome. Thus, even if the BIA had articulated a new standard, Garay would still have failed to show prejudice, and thus would not be entitled to relief. *See Padilla-Martinez v. Holder*, 770 F.3d 825, 830 (9th Cir. 2014) ("To prevail on a due-process claim, a petitioner must demonstrate both a violation of rights and prejudice.").

As we have explained in Section II B 1, the BIA imposes the particularity requirement in order to distinguish between social groups that are discrete and those that are amorphous. *See supra* page 17–18.  In *W–G–R–*, the BIA explained that particularity "chiefly addresses the question of delineation, or as earlier court decisions described it, the need to put 'outer limits' on the definition of 'particular social group.'" *Matter of W–G–R–*, 26 I. & N. Dec. at 214.[11]

Although we have recognized that "social visibility" and "particularity" tend to blend together, we have not merged the two prongs.  *Henriquez-Rivas*, 707 F.3d at 1090–91.  As noted, we held that "[t]he 'particularity' requirement is separate, and it is relevant in considering whether a group's boundaries are so amorphous that, in practice, the persecutor does not consider it a group." *Id*. at 1091. We stated that "the 'particularity' consideration is merely one factor as to

---

[11] The BIA referred in its opinion to its decision in *Matter of M–E–V–G*, 26 I. & N. Dec. 227, decided the same day. In *M–E–V–G*, the BIA explained:

> A particular social group must be defined by characteristics that provide a clear benchmark for determining who falls within the group. *Matter of A–M–E– & J–G–U–*, 24 I. & N. Dec. at 76 (holding that wealthy Guatemalans lack the requisite particularity to be a particular social group).  It is critical that the terms used to describe the group have commonly accepted definitions in the society of which the group is a part.  *Id*. (observing that the concept of wealth is too subjective to provide an adequate benchmark for defining a particular social group).

*Id*. at 239.  The BIA further held that a "group must also be discrete and have definable boundaries—it must not be amorphous, overbroad, diffuse, or subjective." *Id*.

whether a collection of individuals is considered to be a particular social group in practice." *Id.*

The BIA's application of the "particularity" requirement to Garay's purported class of "deportees from the United States to El Salvador" was reasonable. The BIA found that a proposed class of deportees was too amorphous, overbroad and diffuse because it included men, women, and children of all ages, regardless of the length of time they were in the United States, the reasons for their removal, or the recency of their removal. *Matter of W–G–R–*, 26 I. & N. Dec. at 223. Garay presented scarcely any contrary evidence.[12] Viewing all the evidence, the BIA's rejection of Garay's proposed class was reasonable, if not compelled.

Indeed, the BIA's determination is supported by case law declining to recognize much more circumscribed purported

---

[12] Garay's only testimony in support of his proposed particular social group of deportees was: "Because almost all the time the people that are returned from here, or they are deported from here, they stay in detention for investigation purposes." However, Garay then qualified his statement by indicating that the government was most interested in individuals who have criminal records. In his brief to the BIA, Garay alleged in a footnote that he "faces a danger of future persecution based on his membership in a particular social group of deportees from the United States to El Salvador," and objects that the IJ "did not address this social group definition at all." In the next section of his brief, which addresses his claim for relief under the CAT, Garay argued that he will be tortured because he is a former gang member and a deportee. He asserts that deportees are mistreated upon their return because they are presumed to be gang members. Taking Garay's assertions at face value, they do not support a finding that all deportees from the United States constitute a "discrete class of persons." *Matter of S–E–G–*, 24 I. & N. Dec. at 584.

groups of deportees.**[13]**  Most recently, in *Ramirez-Munoz v. Lynch*, 816 F.3d 1226 (9th Cir. 2016), we affirmed the BIA's determination that a purported class of "imputed wealthy Americans" deported to Mexico did not constitute a particular social group.  Citing *Henriquez-Rivas*, 707 F.3d at 1090, we held that the proposed group was not "sufficiently particular that it can be described with passable distinction that the group would be recognized as a discrete class of persons." *Ramirez-Munoz*, 816 F.3d at 1229.

As in *Ramirez-Munoz*, the BIA's rejection of Garay's purported class of "deportees from the United States to El Salvador" is not contrary to our holding in *Henriquez-Rivas* that "considerations of diversity of lifestyle and origin" may not be "the *sine qua non* of 'particularity' analysis."  707 F.3d at 1093–94.  To go so far would come close to doing away with the particularity requirement, which was included in the plain language of the statute enacted by Congress.  *Aguirre-Aguirre*, 526 U.S. at 419.  However, this was not our intent. Where a petitioner makes a prima facie showing of a "discrete class of persons," neither diversity of lifestyle nor origin will undermine that group.  But where, as here, a petitioner proffers a group that is amorphous rather than discrete, he can hardly be heard to argue that the BIA may not consider the proposed group's lack of cohesion in determining that it is not particular.

---

**[13]** *See, for example, Delgado-Ortiz v. Holder*, 600 F.3d at 1151–52 (holding that "returning Mexicans from the United States" are "too broad" to qualify as a particular social group); *Lizama v. Holder*, 629 F.3d 440, 446–48 (4th Cir. 2011) (holding that "deportees with criminal histories" returning to El Salvador from the United States are "too broad" to constitute a particular social group).

Applying the deference due to the BIA's decision and reviewing the entire record, we reject Garay's challenge to the BIA's determination that his proposed group of "deportees from the United States to El Salvador" is not cognizable.

**V**

Garay challenges the BIA's denial of his CAT claim as based on legal error and on facts not found by the IJ. The Government responds that substantial evidence supports the agency's decision and any error in the BIA's assessment of Garay's CAT claim was invited because he asked the BIA to undertake plenary review of his CAT claim. We find that the denial of Garay's CAT claim was premised on legal error and vacate the denial of CAT relief.

We review de novo issues of law regarding CAT claims. *Edu v. Holder*, 624 F.3d 1137, 1142 (9th Cir. 2010). "The BIA's findings underlying its determination that an applicant is not eligible for relief under the CAT are reviewed for substantial evidence." *Arteaga*, 511 F.3d at 944. Under that standard, we "uphold[] the BIA's determination unless the evidence in the record compels a contrary conclusion." *Id.* Where the BIA conducts its own review of the evidence and law rather than adopting the IJ's decision, "our review is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (internal quotation marks omitted).

To qualify for CAT relief, an applicant must show that "'it is more likely than not that he . . . would be tortured if removed . . . .'" *Cole v. Holder*, 659 F.3d 762, 770 (9th Cir.

2011) (quoting 8 C. F. R. § 208.16(c)(2)). "Acts constituting torture are varied, and include beatings and killings." *Bromfield v. Mukasey*, 543 F.3d 1071, 1079 (9th Cir. 2008); *see also Cole*, 659 F.3d at 771 (same). An applicant for CAT relief does not need to show that he would be tortured on account of a protected ground. *Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir. 2001); *see also Cole*, 659 F.3d at 770 ("[T]he provision for deferral of removal under CAT applies to all applicants, even those who . . . are former gang members convicted of an aggravated felony.").

Reviewing Garay's claim on appeal, the BIA stated that it reviewed the IJ's decision for clear error. *Matter of W–G–R–*, 26 I. & N. Dec. at 224–26. After reviewing evidence related to Garay's claims that he feared torture at the hands of rival gangs, the police, or clandestine death squads, *id.* at 224–25, the BIA concluded that "the Immigration Judge's predictive findings with respect to the respondent's torture claim are not clearly erroneous." *Id.* at 225.

In a footnote, the BIA addressed the IJ's statement that the materials "contain little if any information concerning the treatment of former gang members . . . beyond being killed." *Id.* at 226 n.9. The BIA read the IJ's statement to reflect not that the IJ believed killings are not torture, but "[r]ather, the Immigration Judge held that the evidence was not sufficient to show a clear probability that the respondent would be tortured." *Id.*

## A

We are troubled by the BIA's conclusion that the IJ's "predictive findings with respect to [Garay]'s torture claim

are not clearly erroneous." *Matter of W–G–R–*, 26 I. & N. Dec. at 225.    The BIA did not identify any specific "predictive findings" in the IJ's decision. At oral argument, counsel for the Government was unable to point to any language in the IJ's decision that can be read to constitute "predictive findings."[14]

If the BIA was referring to the IJ's conclusion that Garay had not established that the El Salvadoran police were looking for him, the BIA's conclusion is sound.    This, however, is not enough to support the denial of Garay's CAT claim, which also identified gang members and clandestine death squads as possible sources of feared torture. *See Cole*, 659 F.3d at 775 (remanding where the BIA failed to "consider the aggregate risk that Cole would face from police, death squads, and gangs if returned to Honduras").

If the "predictive findings" the BIA was referring to include the IJ's discounting of Garay's written description of the torture he feared at the hands of gang members, this is problematic for a number of reasons.    First, the IJ's discounting of Garay's description of the torture he feared cannot reasonably be characterized as a "predictive finding." Second, the BIA did not acknowledge or correct the IJ's apparent disregard of Garay's written declaration describing Mara 18's practice of killing defectors by placing tires around them and setting them on fire. Garay's failure to reiterate this assertion in his testimony does not negate the assertion. *See, e.g.*, *Lai v. Holder*, 773 F.3d 966, 971 (9th Cir. 2014) ("It is

---

[14] Before us, the Government does not adopt the BIA's reading of the IJ's statement, but posits that the IJ "apparently meant that the materials were no more specific than [Garay's testimony] about how the death of former gang members might come about."

well established that 'the mere omission of details is insufficient to uphold an adverse credibility finding.'" (quoting *Singh v. Gonzales*, 403 F.3d 1081, 1085 (9th Cir. 2005))); *Tekle v. Mukasey*, 533 F.3d 1044, 1053 (9th Cir. 2008) (finding legal error where IJ failed to provide the petitioner with an opportunity to explain a perceived inconsistency).

Most importantly, however, the BIA's interpretation of the IJ's statement as a "predictive finding" is problematic because it does not correct the IJ's inference that killings are not torture. Whether reviewed for clear error as a factual finding or reviewed de novo as a question of law or judgment,[15] we cannot read the IJ's statement as reflecting anything other than an erroneous view that killings are not torture.[16] *Bromfield*, 543 F.3d at 1079 ("Acts constituting torture are varied, and include beatings and killings.").

The BIA should have acknowledged and corrected the IJ's error and remanded the matter to the IJ. *See Figueroa v.*

---

[15] In *Ridore v. Holder*, 696 F.3d 907 (9th Cir. 2012), we agreed with the Third Circuit that the "likelihood of torture" encompasses two inquiries: "'(1) what is likely to happen to the petitioner if removed; and (2) does what is likely to happen amount to the legal definition of torture." *Id.* 915–16 (quoting *Kaplun v. Att'y. Gen.*, 602 F.3d 260, 271 (3d Cir. 2010)). The first is a factual question and subject to clear error review; the second is a legal question subject to de novo review. *Id.*

[16] Garay alleges in his Reply Brief that the same IJ that heard Garay's case concluded in another case that killing is not torture. It appears that in an unpublished decision, the BIA remanded in light of our opinion in *Bromfield*, 543 F.3d 1071, to permit the IJ to conduct further fact-finding in order to determine "whether the killings at issue in [that] case constituted torture." *See In re Dionicio Ziranda-Ambriz*, File No. A088-738-879 (BIA Jan. 22, 2013) at 3.

*Mukasey*, 543 F.3d 487, 498 (9th Cir. 2008) (reversing and remanding where the BIA failed to correct an IJ's legal error). Further, it appears that the IJ's error prevented the IJ from undertaking the necessary review of all the record evidence, including evidence that former gang members are killed, and from assessing whether Garay demonstrated a probability that he would be killed or otherwise tortured.[17]

## B

The Government maintains that, despite the BIA being generally precluded from undertaking its own fact finding in the first instance, it could do so on Garay's appeal because he requested plenary review of his CAT claim. We reject this argument.

As the Government concedes, the BIA was not empowered to undertake the necessary fact finding to decide

---

[17] We also reject the BIA's alternative basis for denying CAT relief. The BIA purported to find that there was insufficient evidence of government acquiescence to any torture by gang members. *W–G–R–*, 26 I. & N. Dec. at 226; *see* 8 C. F. R. § 208.18 (defining torture in relevant part as "pain or suffering . . . inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."). However, the IJ did not make any findings about acquiescence and the BIA's own regulations prevent the BIA from making its own factual findings and require it to remand cases to the IJ if further fact-finding is needed. 8 C. F. R. § 1003.1(d)(3)(I), (iv). The BIA followed this principle in the withholding context when it declined to discuss whether the Salvadoran government was unable or unwilling to control the Mara 18 gang members because the IJ had not made findings on it, but oddly, it did not follow the same rule in the CAT context. *Compare W–G–R–*, 26 I. & N. Dec. at 224 n.8 *with id.* at 226.

Garay's claim in the first instance.**[18]** Moreover, the invited error doctrine, which the Government invokes, does not relieve the agency of its obligation to follow its own regulations and apply the correct standard of review. *Cf. Amado v. Gonzalez*, 758 F.3d 1119, 1133 n.9 (9th Cir. 2014) ("'[I]t is one thing to allow parties to forfeit claims, defenses, or lines of argument; it would be quite another to allow parties to stipulate or bind us to application of an incorrect legal standard, contrary to the congressional purpose.'" (quoting *Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009))); *United States v. Lindsey*, 634 F.3d 541, 555 (9th Cir. 2011) ("[I]n order for the invited error doctrine to apply, a defendant must both invite the error and relinquish a known right.").

## VI

Accordingly, we deny Garay's petition with respect to his withholding claims, and grant only with respect to the denial

---

**[18]** Under 8 C. F. R. § 1003.1(d)(3)(I) and (iv), "(1) the Board will not engage in de novo review of findings of fact determined by the immigration judge; and (2) except for the taking of administrative notice of commonly known facts, the Board will not engage in factfinding in the course of deciding appeals." *Brezilien v. Holder*, 569 F.3d 403, 412 n.3 (9th Cir. 2009); *Ridore*, 696 F.3d at 911. "Rather, '[f]acts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.'" *Id*. (quoting 8 C. F. R. § 1003.1(d)(3)(I)). "[T]he BIA cannot disregard the IJ's findings and substitute its own view of the facts. Either it must find clear error, explaining why; or, if critical facts are missing, it may remand to the IJ." *Id.* at 919. "In contrast to these substantive limitations on factfinding, '[t]he Board may review questions of law, discretion, and judgment on all other issues in appeals from decisions of immigration judges de novo.'" *Brezilien*, 569 F.3d at 412 n.3 (quoting 8 C. F. R. § 1003.1(d)(3)(ii)).

of his application for CAT relief, which we vacate and remand to allow the agency to reconsider the application for CAT relief recognizing that killings can constitute torture and to undertake the requisite fact finding in accordance with the agency's regulations.

**PETITION FOR REVIEW GRANTED in part and DENIED in part; denial of CAT relief VACATED and REMANDED.**