In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-2604

DAVID JAPHETH FIDDLER,

*Petitioner*,

*v.*

PAMELA J. BONDI, Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A041-653-380

ARGUED MAY 15, 2025 — DECIDED AUGUST 7, 2025

Before RIPPLE, KIRSCH, and KOLAR, *Circuit Judges*.

RIPPLE, *Circuit Judge*. In April 2021, the Department of Homeland Security ("DHS") initiated removal proceedings against David Fiddler, a citizen of Jamaica. Mr. Fiddler requested deferral of removal under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied relief,[1]

---

[1] A.R. 157.

and the Board of Immigration Appeals ("BIA" or "Board") affirmed that decision.[2] We now deny Mr. Fiddler's petition for review.[3]

# I

# BACKGROUND

## A.

Mr. Fiddler was admitted to the United States on May 10, 1988, when he was ten years old. On February 19, 1998, he was convicted in Illinois of first-degree murder and of attempted first-degree murder and sentenced to twenty-eight years in prison. On April 2, 2021, the DHS initiated removal proceedings, charging Mr. Fiddler with removability under 8 U.S.C. § 1227(a)(2)(A)(iii).[4]

Mr. Fiddler suffers from severe mental illness that began when he was a child. He has been diagnosed with schizophrenia, characterized by hallucinations, delusional thinking, and erratic behavior. His schizophrenia often went untreated during his childhood, and he has been hospitalized thirty times. When he has been in treatment, he has complied, and his symptoms have significantly subsided.

As part of the removal proceedings, the IJ assessed Mr. Fiddler for competency and appointed a representative to assist him. His representative conceded removability;

---

[2] *Id.* at 5.

[3] Our jurisdiction is secure under 8 U.S.C. § 1252(a)(4).

[4] The notice to appear cited as grounds for Mr. Fiddler's removal his convictions for aggravated felonies relating to murder and attempted murder. *See* A.R. 1511.

however, Mr. Fiddler applied for deferral of removal under the CAT.[5] In support of his petition, Mr. Fiddler submitted that, if deported, he is likely to face violence due to his mental illness. Specifically, he believes that he will be unable to find adequate mental health care and will become homeless. He maintains that, consequently, he will be targeted by Jamaican police and face violence in prison. He also fears that private individuals, with the acquiescence of Jamaican law enforcement authorities, will target him.

At a hearing on Mr. Fiddler's petition, an expert witness testified on mental health stigma and mental health services in Jamaica. The expert testified about the many risks of violence and stigma that mentally ill individuals face in Jamaica. He explained that individuals who are deported to Jamaica are stigmatized and "local police are informed about arriving deportees and may track and harass them."[6] Mr. Fiddler submitted evidence suggesting that mentally ill individuals make up a disproportionate amount of the victims of police killings, but it is unclear exactly how many instances of police violence involve mentally ill individuals.[7] He also submitted a 2013 article in which a Jamaican government official said that "some 75 percent of the police confrontations with the mentally ill

---

[5] Mr. Fiddler does not dispute that he is ineligible for asylum or withholding of removal because he has been convicted of a particularly serious crime. 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). His claim is solely for deferral of removal under the CAT.

[6] A.R. 146.

[7] *Id.* at 151. Specifically, Mr. Fiddler cites evidence that in 2016, there were 55,000 mentally ill people in Jamaica, out of 3 million total people, making up 1.8% of the population but 19% of police shootings in 2020. Appellant's Br. 39–40.

end with fatalities, while 25 percent end in injuries."[8] However, he did not submit more recent or more concrete evidence to support this assertion.

Mr. Fiddler also provided articles documenting poor conditions in prisons and instances of vigilante violence by private individuals targeting the mentally ill. The expert witness testified that, ultimately, "it is highly likely [that Mr. Fiddler] will end up homeless and untreated, which could lead him to him being victimized by vigilante justice or coming to the attention of the police, who could arrest, detain, and/or subject him to police brutality."[9] The IJ issued a written decision on October 6, 2021, denying Mr. Fiddler relief.

### B.

In May 2022, the BIA remanded the case and directed the IJ to provide further analysis and factual development. The IJ handed down a new decision on August 30, 2022. This decision provided more extensive discussion but nevertheless reached the same conclusion. The IJ held that Mr. Fiddler had not established that he would face a substantial risk of torture if he returned to Jamaica. The IJ accepted much of the expert witness's testimony and agreed that Mr. Fiddler is likely to become homeless and "come to the attention of law enforcement or the public generally."[10] However, the IJ concluded that when his evidence was "considered cumulatively,

---

[8] A.R. 607.

[9] *Id.* at 146.

[10] *Id.* at 148.

[Mr. Fiddler] has not established a substantial risk of future torture."[11]

Examining police violence in non-custodial settings, the IJ further ruled that Mr. Fiddler did not establish a substantial risk of "being shot and killed by police," because "it appears that mentally ill individuals make up a relatively small number of police shooting deaths each year."[12] Moreover, Mr. Fiddler did not show that police practices embodied the requisite intent or purpose of torture. Rather, "instances of violence against mentally ill individuals appear to be the unfortunate result of a combination of stigma, lack of training, and lack of resources, which does not amount to torture."[13]

The IJ also held that Mr. Fiddler had not established a substantial risk of torture if he were to be detained or imprisoned. The IJ explained that although Jamaican prisons can be life-threatening, and "individuals with mental disabilities are particularly vulnerable," these conditions do not establish the requisite intent to engage in torture.[14] The IJ also concluded that any reported intentional harm appears to be in isolated instances and thus is unlikely to occur.

Mr. Fiddler appealed this IJ decision, and the BIA affirmed. It held that Mr. Fiddler "did not show that the harm he fears would be the result of a specific intent to torture him," and that he therefore "did not meet his burden of proof to

---

[11] *Id.*

[12] *Id.* at 151.

[13] *Id.* at 153.

[14] *Id.* at 154.

establish his eligibility for deferral of removal under the CAT."[15]

Mr. Fiddler then sought further review in our court, but at the BIA's request, we remanded to the BIA.[16] The Board then affirmed again, with one judge dissenting. The Board reiterated its first holding and held that Mr. Fiddler had not demonstrated the specific intent to torture mentally ill individuals by Jamaican officials, nor had he established that Jamaican officials acquiesce to harm by private individuals. By contrast, the dissent viewed the "alarming pattern of police shootings and killings of mentally ill individuals in Jamaica" as involving intentional acts.[17] Moreover, the dissenting judge believed that Mr. Fiddler would be at "significant risk" of a violent encounter with police due to his "erratic and oppositional behavior"[18] were he to be removed to Jamaica. Finally, in the dissent's view, if Mr. Fiddler were to be arrested or

---

[15] *Id.* at 87.

[16] The BIA sought remand to consider further the issue of specific intent. In particular, it intended to evaluate whether the IJ's ruling on specific intent was dispositive of Mr. Fiddler's entire CAT claim, whether widespread police violence can evince specific intent, and whether the elements of specific intent and proscribed purpose require separate findings.

The Government's request to remand is not a confession of error in the single-judge BIA opinion. *See Ren v. Gonzales*, 440 F.3d 446, 449 (7th Cir. 2006). Rather, the Government may request a remand to have "an opportunity to reconsider" its position. *Id.* However, the BIA is not required to consider those issues on remand.

[17] A.R. 6 (Saenz, J., dissenting).

[18] *Id.*

institutionalized, he would likely endure physical and sexual assault amounting to torture.

## II

## DISCUSSION

### A.

We begin with an examination of the legal landscape. Under the CAT, the United States must withhold or defer removal to countries where an applicant will, more likely than not, be subject to torture. The CAT is implemented in 8 C.F.R. §§ 208.16, 208.17, and 208.18. These regulations provide that applicants are eligible for protection under the CAT if they can "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." § 208.16(c)(2). Under the regulations:

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person … for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity.

§ 208.18(a)(1). Further, the regulations require specific intent: "In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." § 208.18(a)(5).

The BIA also has said that, for an act to amount to torture, the act "must be an *extreme* form of cruel and inhuman

treatment, *not* lesser forms of cruel, inhuman, or degrading treatment or punishment that do not amount to torture." *In re J-E-*, 23 I. & N. Dec. 291, 297 (B.I.A. 2002) (en banc). Also, "the act must be *specifically intended* to inflict severe physical or mental pain or suffering. … [R]ough and deplorable treatment, such as police brutality, does *not* amount to torture." *Id.* at 298. Additionally, the regulations address the *reason* for possibly torturous acts, which courts have referred to as the "proscribed purpose" requirement. *See Bopaka v. Garland*, 123 F.4th 552, 563 (1st Cir. 2024); *see also In re J-E-*, 23 I. & N. Dec. at 298 ("[T]he act must have an illicit purpose."). These two aspects of torture, intent and purpose, have a symbiotic relationship. The BIA has explained:

> The definition of torture illustrates, but does not define, what constitutes a proscribed or prohibited purpose. Examples of such purposes include the following: obtaining information or a confession; punishment for a victim's or another's act; intimidating or coercing a victim or another; or any discriminatory purpose. The Foreign Relations Committee noted that these listed purposes indicate the type of motivation that typically underlies torture, and it recognized that *the illicit purpose requirement emphasizes the specific intent requirement.*

*In re J-E-*, 23 I. & N. Dec. at 299 (emphasis added).

The regulations also contain guidelines for assessing these claims:

> In assessing whether it is more likely than not that an applicant would be tortured in the

proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

§ 208.16(c)(3). Finally, "evidence about generalized violence or danger within a country is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country." *Lozano-Zuniga v. Lynch*, 832 F.3d 822, 830 (7th Cir. 2016). "That [an applicant] is returning to a dangerous country, by itself, does not permit him to make out a CAT claim." *Sumba-Yunga v. Garland*, No. 23-3046, 2024 WL 4930396, at *6 (7th Cir. Dec. 2, 2024) (unpub.).

**B.**

We now apply this framework to the merits of Mr. Fiddler's petition. First, he challenges the Board's determination

that he did not establish that governmental actors in Jamaica with whom he might come into contact would act with the specific intent to torture him. He believes that the frequency of police encounters with mentally ill individuals that result in the use of firearms by the authorities establishes specific intent. He also takes issue with the Board's holding that there is insufficient evidence that Jamaican authorities acquiesce in torture by private actors.

**1.**

The BIA characterized the major inquiry on Mr. Fiddler's attempt to establish specific intent as whether there is "specific intent to torture mentally ill individuals."[19] Mr. Fiddler regards this approach as overly simplistic and misleading. In his view, such an articulation impermissibly conflates the specific intent requirement with the proscribed purpose requirement. Furthermore, he submits that the Board misunderstood the role of each of those elements. From his perspective, "intent" and "purpose" are two separate aspects of torture that require two distinct inquiries. He believes that a police shooting, by the very nature of the act, satisfies the specific intent requirement because it inflicts severe pain. The "purpose" element, he continues, is satisfied because the target of the shooting is a member of a group of people (the mentally ill) who are stigmatized in contemporary Jamaican society.

The BIA's interpretative approach comports well with the nature and purpose of the CAT and with the practicalities of its operation. Subsection 208.18(a) sets forth the general definition of torture and the following subsections elaborate on various aspects of that definition. But the particularized

---

[19] *Id.* at 4.

subsections hardly describe discrete elements that ought to be considered as hermetically sealed off from one another.

Indeed, both commentators and case law recognize that "specific intent" and "proscribed purpose" are, conceptually and pragmatically, "closely linked."[20] When courts previously have considered cases that present difficult questions of intent and purpose, they have recognized the symbiotic relationship of these two terms. CAT cases considering subpar prison conditions have confirmed repeatedly this dynamic. *See Oxygene v. Lynch*, 813 F.3d 541, 550 (4th Cir. 2016) (collecting cases). In these cases, courts have explained that "[a]lthough … authorities are intentionally detaining criminal deportees knowing that detention facilities are substandard, there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." *In re J-E-*, 23 I. & N. Dec. at 301; *see also Matter of J-R-G-P-*, 27 I. & N. Dec. 482, 486–87 (B.I.A. 2018) (holding that Mexican officials did not have "specific intent to torture" the petitioner); *Oxygene*, 813 F.3d at 551 (using similar language); *Escobar v. Garland*, 55 F.4th 662, 670 (8th Cir. 2022) (same). In this context, the purpose, or lack thereof, of poor detainment conditions informs the BIA's determination of whether there is sufficient evidence of intent.

In the present case, the BIA's analysis reflects accurately the relationship between specific intent and the purpose of the Jamaican authorities. The BIA correctly held that Mr. Fiddler failed to establish specific intent to torture. It distinguished between police acting to inflict severe pain and

---

[20] Deborah E. Anker & Jeffrey S. Chase, Law of Asylum in the United States § 7.27 (2024).

suffering on mentally ill individuals when unnecessary to achieve a permissible purpose and police using deadly force for a permissible purpose. In this context, distinguishing between lawful and unlawful purposes is intertwined with distinguishing between lawful and unlawful intent.

Mr. Fiddler has not presented sufficient evidence that police engage in the use of deadly force against mentally ill individuals simply to "inflict severe physical … pain," nor has he presented sufficient evidence of intent to use force for any reason beyond legitimate law enforcement purposes. § 208.18(a)(5). The instances of police violence cited by Mr. Fiddler depict police officers responding to threats to public safety, and he has not identified a practice of police officers using deadly force when such a purpose is not present.[21]

**2.**

The BIA also affirmed the IJ's determination that Mr. Fiddler submitted insufficient evidence to show that the Jamaican government would acquiesce in or "'exhibit willful blindness' to" future torture by private actors.[22] Mr. Fiddler submits that there is evidence of lengthy delays in criminal trials and that violence is rarely investigated, indicating acquiescence by Jamaican officials.

---

[21] The IJ, in weighing the factual evidence, explained that in the police shootings cited by Mr. Fiddler, "the police were responding in the line of duty to situations in which mentally ill persons posed an immediate risk to public safety." A.R. 151.

[22] *Id.* at 4. (quoting *Lozano-Zuniga v. Lynch*, 832 F.3d 822, 831 (7th Cir. 2016)).

To the degree that Mr. Fiddler fears violence from private individuals, that violence must be done with the acquiescence of public officials to qualify as torture under the CAT. *See* § 208.18(a)(1) (requiring that "such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official"). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." § 208.18(a)(7).

Although Mr. Fiddler presented some evidence that private individuals may harm individuals with mental illnesses, he has not demonstrated that this would take place with the acquiescence of Jamaican officials. The Board noted that in the instances cited by Mr. Fiddler, Jamaican authorities investigated the instances of violence, and charges were brought against the offenders. For example, although the 2020 Freedom House report cited by Mr. Fiddler explained that "[g]ang and vigilante violence remain common" and "crime and violence remain deeply entrenched," the report also noted that "[a] range of initiatives to address the problem have been undertaken by successive governments."[23] Moreover, "evidence about generalized violence or danger within a county is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country." *Lozano-Zuniga*, 832 F.3d at 830. Mr. Fiddler also challenges the efficacy of the Jamaican criminal justice system, citing reports of long delays and backlogs. But these reports do not necessarily establish acquiescence to violence or "that

---

[23] *Id.* at 402.

impunity for violence against mentally ill people is wide-spread."[24] They instead suggest that criminal charges are being brought for violent crimes.

Without evidence indicating government acquiescence to the violence, reports of widespread crime do not amount to torture. The record indicates that the Jamaican government generally investigates violence by private individuals and brings charges against them. Further, the reports of vigilante violence cited by Mr. Fiddler do not suggest that "in the majority of cases, police fail to investigate and prosecute such violence."[25] Therefore, based on the record, we affirm the IJ's weighing of the evidence, as affirmed by the BIA, and cannot conclude that the "evidence *compels* a contrary conclusion." *Lopez v. Lynch*, 810 F.3d 484, 492 (7th Cir. 2016) (quoting *Lenjinac v. Holder*, 780 F.3d 852, 855 (7th Cir. 2015)).

### Conclusion

For the foregoing reasons, we deny the petition for review.

PETITION DENIED

---

[24] Appellant's Br. 36.

[25] *Id*. at 37.